MINERVA ORTIZ, demandante y recurrida, *v.* JUAN FRANCISCO PEÑA, demandado y recurrente.

*Número:* R-75-9       *Resuelto:* 16 de febrero de 1979

*Juan M. Ponce Fantauzzi,* abogado del recurrente; *Pedro V. Aguirre,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Ante la Sala de Carolina del Tribunal de Distrito, Minerva Ortiz formuló denuncia contra Juan Francisco Peña por el delito de abandono de menores bajo el entonces vigente Art. 263 del Código Penal de 1937. (33 L.P.R.A. sec. 991.) Minerva había estado casada con Peña. Durante el matrimonio procrearon dos hijos. Uno de éstos nació con posterioridad a la fecha en que se decretó el divorcio de Minerva y Peña. Peña ha atendido sus obligaciones alimenticias para con estos dos hijos. Posteriormente Minerva quedó encinta y nació otro niño, de nombre Eduardo Ortiz. Formuló denuncia contra Peña para reclamarle alimentos para este último hijo.

La Juez Sánchez de la Sala de Carolina requirió de Minerva, de su hijo Eduardo y del acusado Peña que se sometieran a un análisis de sangre. El Dr. Rafael Córdova Márquez, doctor en microbiología y catedrático de hematología de la Universidad de Puerto Rico realizó una primera prueba de sangre a estas tres personas y determinó a base del análisis de sangre que Peña no podía ser el padre de Eduardo. La Juez Sánchez, luego de recibir el resultado de esta primera prueba de sangre, requirió de las partes que se sometieran a una segunda prueba. El Dr. Antonio Barquet, Jefe del Departamento de Hematología y del Banco de Sangre del Centro Médico de Puerto Rico, analizó la sangre y obtuvo idénticos resultados a los obtenidos en la prueba realizada anteriormente; es decir, el segundo análisis de la sangre excluía también a Peña como posible padre de Eduardo. En vista de esto, el 6 de abril de 1972 la Sala de Carolina absolvió a Peña del delito imputádole.

El 14 de abril de 1972 Minerva radicó demanda de filiación contra Peña alegando que éste ha tratado a Eduardo como hijo pero que rehúsa reconocerlo como tal. Celebrado el juicio en que testificó la demandante, el demandado presentó el resultado de ambas pruebas de sangre que requiriera la juez que entendió en el pleito criminal. El tribunal declaró con lugar la demanda expresando que "[l]a prueba aportaba por la parte demandada sobre exclusión de paternidad no es concluyente y así lo determina el Tribunal, véase *Arais* v. *Kalensnikoff*, 10 Cal.2d 428; 74 P.2d 1043 (Cal. 1937); *Harding* v. *Harding*, 22 N.Y.S.2d 810 y 115 A.L.R. 163 y otros casos resuelven la cuestión en armonía con la posición del Tribunal."

Peña solicitó la revisión. Accedimos. Por sentencia de 14 de octubre de 1976 confirmamos. Se nos solicitó la reconsideración. Celebramos vista y las partes fueron oídas. El 26 de mayo de 1977 ratificamos nuestra sentencia pero a la vez reconocimos que "[d]e ordinario los testimonios, por veraces

que parezcan, deben estrellarse y esfumarse ante verdades científicamente comprobadas." Dijimos entonces "las pruebas de sangre, cuando son indubitadas y excluyen la posibilidad de que un hombre sea el padre de una criatura, deben aceptarse como la verdad probada." No obstante, ratificamos nuestra sentencia anterior porque del testimonio del perito que hizo las pruebas de sangre surgía que el análisis de sangre practicado al niño se refería "a un niño de nombre Eduardo Ortiz y no a Juan Almeido Ortiz, que es el nombre del niño cuya paternidad se imputa al demandado." (Sentencia del 14 de octubre de 1976.)

Peña solicitó ante el tribunal de instancia que se le relevara de la sentencia y el Tribunal Superior dictó una orden el 2 de junio de 1977 en la cual consignó que "estaría dispuesto a permitir la prueba pertinente, todo ello condicionado a que el Tribunal Supremo concediera permiso para ello." Por resolución de 2 de septiembre de 1977 consentimos.

Celebrada la vista ante el Tribunal Superior, William Fred Santiago, J., la demandante declaró: ". . . En ambos casos [la acción penal por abandono de menores y la demanda de filiación] se trata del mismo niño y todas las pruebas de sangre se le han hecho a ese mismo niño." El juez determinó que "[l]a prueba presentada señala que hay identidad entre Eduardo y Juan Almeido, correspondiendo estos dos nombres a una misma persona, que es el mismo niño objeto y sujeto del caso ante el Tribunal de Distrito de Puerto Rico, Sala de Carolina y en el Tribunal Superior de Puerto Rico, Sala de San Juan."

Invocando esta resolución, Peña nos pide la reconsideración de nuestra sentencia de 26 de mayo de 1977 y la revocación de la dictada por el Tribunal Superior declarando con lugar la demanda de filiación.

La jurisprudencia que sirviera de base al juez de instancia para dar curso a la demanda de filiación, *Arais* v. *Kalens-*

*nikoff*, 74 P.2d 1043 (Cal. 1937) (¹) y *Harding* v. *Harding*, supra, ha perdido su vigencia. Tanto en California como en Nueva York se legisló con posterioridad a esos casos para admitir el resultado de las pruebas de sangre que excluyen la posibilidad de paternidad—West Ann. California Evidence Code, Sec. 895. McKinney's *Consolidated Laws of N.Y.*, Book 29 A, Part I, Section Index, Sec. 532, pág. 483. Los principios de derecho sentados en esos casos y otros análogos han quedado enervados ante el progreso continuo que se evidencia en el campo de las investigaciones de las ciencias médicas en general y las ramas altamente especializadas de la inmunología, y la serología—dentro de la rama de hematología—en particular.

La sociedad contemporánea se caracteriza por la especialización tecnológica. En el campo de la investigación científica se orienta hacia el descubrimiento y la demostración de fenómenos diversos que a fuerza de repetida corroboración, logran alcanzar el status de hechos o verdades científicamente comprobables. Así, a través de los años la ciencia médica ha logrado identificar numerosos componentes genéticos de la sangre humana que reciben el nombre de "factores" o "particularidades". (²) La presencia de cualesquiera de estos factores en la sangre de un individuo está predeterminada con arreglo a las leyes de genética mendelianas, esto es, dichos factores tienen la naturaleza de características hereditarias que se transmiten de progenitor a engendrado a lo largo de las generaciones. Además, la presencia de estos "factores" hereditarios en la sangre sirve de base a la clasificación de la

---

(¹) La decisión en el caso de *Arais* ha sido fuertemente criticada. Véanse Larson, *Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond*, 13 J. Fam. L. 713, 715 (1973–74); Reade, *From Here to Paternity*, 3 South Dakota L. Rev. 125–137 (1958).

(²) En el idioma inglés se denominan indistintamente *"factors"*, *"specificities"*, *"markers"* o *"determinants"*. Larson, *op. cit.* en escolio anterior, p. 718. Véase además Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J. Fam. L. 543, 554 (1977–78).

misma en determinados grupos o sistemas y estos grupos o sistemas, a su vez, son los cimientos sobre los cuales se han estructurado las diversas pruebas de sangre que conocemos al presente.

Dentro del campo de la medicina hay varias ramas especializadas en el estudio de la sangre. (³) Se destacan entre ellas la hematología, la inmunología y la serología. (⁴) El progreso tecnológico que ha culminado en el perfeccionamiento de las diversas pruebas de sangre que hoy conocemos es en gran medida el producto del esfuerzo combinado de tecnólogos, hematólogos, inmunólogos y serológos. Para 1975 se contaba ya con un total de 57 pruebas para la clasificación de la sangre. Shaw y Kass, *Illegitimacy, Child Support and Paternity Testing*, 13 Houston L. Rev. 41, 51 (1975). Cerca

---

(³)La sangre, es una sustancia semi-líquida que contiene un 40% de sustancias sólidas que son los eritrocitos, los leucocitos y los trombocitos. El restante 60% del componente sanguíneo está integrado por una sustancia líquida denominada plasma que a su vez contiene una variedad de elementos solubles que incluyen colesterol, azúcar, sales, lípidos o grasas y enzimas que ayudan a digerir la proteína alimenticia. El suero sanguíneo es aquel fluido acuoso de color amarillento que está presente en el plasma. El suero contiene varias sustancias inorgánicas en solución y un buen número de compuestos nitrogenados que son las proteínas. Estas proteínas son de dos clases: albúminas y globulinas. Ciertas globulinas contienen anticuerpos, esto es, sustancias que forman una barrera proctectora contra la intromisión de cuerpos extraños, previniendo así las infecciones. Las albúminas son las que ejercen la presión osmótica necesaria para mantener y estabilizar la presión sanguínea. Véase Larson, *op. cit.* en escolio 1, pág. 741.

(⁴)La hematología estudia tanto la ordenación y el funcionamiento del tejido sanguíneo como las enfermedades que suelen atacarlo, esto es, dicha rama comprende tanto el estudio histológico como el estudio patológico del tejido sanguíneo. La inmunología dirige su atención al estudio de los leucocitos o células blancas que, junto a los eritrocitos o células rojas y los trombocitos o plaquetas, comprenden el conjunto de sustancias que forman el componente sólido de la sangre. Estos leucocitos forman la base del sistema inmunológico encargado de la defensa del organismo. Por último, la serología—como rama especializada de la inmunología—tiene por objeto el análisis del suero sanguíneo, entendiéndose por suero aquel fluido acuoso de color amarillento que queda como remanente en el plasma sanguíneo cuando se sustrae del plasma la proteína con propiedades coagulantes denominada fibrinógeno. *Id.* Larson, *op. cit.*

de una docena de pruebas serológicas constituye el repertorio principal que se ha venido utilizando a través de los años.

En la práctica, los resultados obtenidos de las pruebas que con mayor frecuencia se utilizan reflejan una precisión y confiabilidad en grados suficientes para justificar su admisibilidad ante los tribunales como prueba concluyente de que un individuo a quien se le imputa la paternidad de una criatura no es su padre biológico. Forrest, *Legal Implications of HLA Testing for Paternity*, 16 J. Fam. L. 537 (1977–78); Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J. Fam. L. 543 (1977–78); Shaw & Kass, *Illegitimacy, Child Support and Paternity Testing*, supra. Es pertinente consignar que la tendencia más reciente en el área de la investigación de las pruebas serológicas para la exclusión de la paternidad se orienta a demostrar científicamente las probabilidades de que un individuo sea el padre de un niño. Shaw & Kass, *op. cit.*, pág. 52, escolio 6.

El problema relacionado con la admisibilidad en evidencia de estas pruebas serológicas en casos en que la paternidad está en controversia ha sido tema que atrae la atención de las cortes desde hace bastante tiempo.

■ En la Europa continental(⁵) se utiliza la prueba de sangre en estos casos desde la década de los veinte como prueba concluyente para establecer la no paternidad. Schock, *Determinants of Paternity by Blood Grouping: The European Experience*, 16 So. Calif. L. Rev. 177 (1943). En los Estados Unidos se utilizó por primera vez el resultado de un análisis

---

(⁵)La Corte Suprema de Casación de Italia expresó en una opinión citada en *Beuschel* v. *Manowitz*, 271 N.Y.S. 277–281 (1934):

"As regards the reliability of the results obtained by this method the latest studies and investigations show that though the determination of the blood groups afford no positive evidence for a declaration of filiation in a given case, it does, on the other hand, furnish incontrovertible evidence for the exclusion of this relationship when the child's blood group does not agree, according to a definite scheme, with that of the supposed father."

de sangre para establecer que el hombre que se alegaba era el padre de una criatura no podía serlo en el caso de *Commonwealth* v. *Zammarelli,* 17 Pa. D. & C. 229, resuelto en el año 1931. Con posterioridad a esa fecha se ha reconocido el valor probatorio de los análisis de sangre para negar la paternidad. *Anonymous* v. *Anonymous,* 460 P.2d 32 (Ariz. 1960); *Jordan* v. *Mace,* 69 A.2d 670 (Me. 1949); *Cortese* v. *Cortese,* 76 A.2d 717 (N.J. 1950); *Beach* v. *Beach,* 114 F.2d 479 (U.S. App. D.C. 1940); *Retzer* v. *Retzer,* 161 A.2d 469 (D.C. Mun. App. 1960); *Commonwealth* v. *D'Avella,* 162 N.E.2d 19 (Mass. 1959); *Houghton* v. *Houghton,* 137 N.W.2d 861 (Neb. 1965); *Ross* v. *Marx,* 90 A.2d 545 (N.J. 1952); *Groulx* v. *Groulx,* 103 A.2d 188 (N.H. 1954); *Shepherd* v. *Shepherd,* 265 N.W.2d 377 (Mich. 1978); *Hanson* v. *Hanson,* 346 N.Y.S.2d 996 (N.Y. 1973); *Jackson* v. *Jackson,* 430 P.2d 289 (Calif. 1967). En *McCormick on Evidence* (2nd. ed. 1972) se expresa:

"... Parece ser que la certeza en la confiabilidad de las pruebas de sangre para determinar no paternidad, cuidadosamente efectuadas por expertos y adecuadamente supervisadas, están hoy tan universalmente aceptadas por los científicos, que las cortes deberían tomar conocimiento judicial de ello y podrían sabiamente conferirle efecto concluyente a ese tipo de prueba."

Al mismo efecto Ross, *The Value of Blood Tests as Evidence in Paternity Cases,* 71 Harv. L. Rev. 466 (1958); Harper & Schlonisck, *Problems of the Family,* pág. 4 (ed. 1962); Schatkin, *Disputed Paternity Proceedings,* Cap. X, The Unerring Accuracy of Blood Test (4ta. ed. 1967); Beautyman, *Paternity Actions, A Matter of Opinion or Trial of the Blood?* 1976 Legal Medicine Annual, pág. 239.

En el artículo de Ross antes citado publicado hace 20 años, se explica convincentemente el porqué debe ser concluyente la prueba de sangre. Sostiene el citado autor que aun cuando la certeza de las pruebas de sangre para excluir paternidad no sea de la magnitud que se le atribuye, una deci-

sión basada en estas pruebas siempre goza de mayor certeza legal—o certeza moral, para usar la expresión del Art. 366 de la Ley de Evidencia, 32 L.P.R.A. sec. 1624—que aquella basada en los medios de prueba convencionales. Cuando se juzga la paternidad a base de los medios de pruebas más tradicionales—esto es, evidencia testifical, documental y demostrativa, incluyendo parecido físico—la probabilidad de error será siempre mayor que cuando la adjudicación de no paternidad descansa en una prueba de sangre debidamente realizada. Así, por ejemplo, presumiendo que la probabilidad de certeza de las pruebas de sangre para excluir paternidad sea de un 99%—la probabilidad es en verdad mayor que eso—el tribunal sólo se equivocaría en uno de cada 100 casos al adjudicar la controversia de conformidad con el resultado de las pruebas de sangre. No es nada aventurado decir que el juez más cuidadoso en la evaluación de la prueba convencional se equivocará en no menos de 25 casos, pues estará siempre dirimiendo un conflicto de pruebas de carácter testifical—aun incluyendo el pericial—y de otra índole. De ahí que sea preferible aceptar incondicionalmente el resultado de las pruebas de sangre para excluir la paternidad, aun cuando no haya otra evidencia que corrobore tal resultado. Las autoridades llegan a proponer que no se admita otra evidencia en contrario.

■ Por supuesto todo esto tiene como base que el fin de las reglas de evidencia es que la mayoría de los casos sean adjudicados correctamente, es decir, que haya correspondencia entre las conclusiones de hechos del tribunal y lo que en verdad ha ocurrido en la realidad extrajudicial. Aceptado tal postulado, las pruebas de sangre para excluir paternidad deben tener, sostiene Ross, valor absoluto e incondicional. Con miras a hallar la verdad la mejor regla es conferir valor absoluto e incondicional al resultado de las pruebas de sangre para excluir paternidad. No habiendo otro tipo de evidencia que sea ni remotamente comparable al grado de certeza que

brinda una prueba de sangre para excluir paternidad, resolvemos que el resultado de esta prueba debe ser considerado como absoluto e incondicional, excluyendo la estimación de otra evidencia. ([6])

Desde la década de los treinta en la jurisdicción federal se aceptaba la prueba de sangre como concluyente para establecer la no paternidad y en *Beach* v. *Beach*, 114 F.2d 479 (D.C. Cir. 1940) el tribunal de instancia hizo uso del mecanismo provisto por la Regla 35 de las de Procedimiento Civil federal, equivalente a nuestra Regla 32 de las de Procedimiento Civil de 1958, para ordenar a las partes en un pleito sobre alimentos a que se sometieran a un análisis de la sangre. Se recurrió de esa orden y la Corte de Apelaciones para el Distrito de Columbia la sostuvo. Posteriormente otras cortes siguieron la norma establecida en *Beach* v. *Beach* y finalmente en el 1970 se enmienda expresamente la Regla 35 federal para que, como se expresa en 8 Wright and Miller, *Federal Practice & Procedure*, a la pág. 680: "La regla fue enmendada en 1970 para hacerla aplicable a situaciones en que 'el estado mental o físico (y aquí se incluye la clasificación sanguínea) está en controversia' y de ese modo la regla codifica la doctrina de los casos que admiten las pruebas serológicas."

Es conveniente transcribir lo expresado en *Anonymous* v. *Anonymous*, antes citado, para que sirva como norma al pasar sobre la admisibilidad en evidencia del resultado de estos análisis de sangre. Se expresó en el citado caso a las págs. 35–36:

"Presumiendo que unas pruebas de identificación de grupo sanguíneo fueron debidamente realizadas, ¿resultaría clara y convincente la evidencia provista por éstas para eliminar la

---

([6]) No obstante el hecho de que la prueba de sangre es concluyente para negar la paternidad, si la persona ha reconocido a otra como hijo en forma indubitada, se ha resuelto que no debe permitírsele cesar en sus responsabilidades como padre. *Watts v. Watts*, 337 A.2d 350 (N.H. 1975).

posibilidad de que el esposo sea el padre del hijo de su esposa? Creemos que dicha evidencia es no sólo clara y convincente, sino determinante para la cuestión. *Beach* v. *Beach,* supra; *Anonymous* v. *Anonymous,* supra. . . .

No significa esto que los tribunales deban abdicar su función tradicional de escudriñadores de la verdad a favor de los laboratorios de científicos y peritos médicos. Las palabras claves para llegar a esta decisión son 'debidamente realizadas'. Para que una determinada prueba de identificación de grupo sanguíneo alcance el grado de infalibilidad al que la hemos elevado, es necesario examinar minuciosamente la corrección de los procedimientos científicos utilizados y sondear la capacidad del perito supervisor. Los errores pueden ser producto de la dificultad que pueda tener el laboratorio para conseguir el antisuero con la concentración y clasificación debida; en algunos casos, los errores pueden deberse a la presencia de anticuerpos bloqueantes en el suero sanguíneo, ocasionados por transfusiones o por embarazo; los errores pueden ocurrir al no seguirse los métodos de prueba recomendados por los fabricantes del antisuero utilizado; también pueden deberse a que el técnico de laboratorio no vio el proceso de aglutinación, bien por falta de destreza o de atención; y particularmente en la prueba de clasificación de sangre según el factor Rh, los errores pueden deberse a la poca destreza de la persona que la realiza. (Para un análisis completo de estos problemas, véase R. Gray, *Attorneys' Textbook of Medicine,* vol. 4, pars. 304.08–.13 (3ra. ed., 1968).) Estos y otros problemas deben poder resistir la mirada penetrante del examen judicial. Aunque la transmisión del tipo sanguíneo sea una ley natural, la identificación del mismo está sujeta a las fallas inherentes a toda conducta humana. Estas pruebas podrán considerarse concluyentes sólo cuando el juzgador de los hechos se sienta satisfecho, dada la evidencia clara y convincente, de la capacidad del perito y de la corrección de los procedimientos utilizados en las pruebas . . . ."

Ver además Littell & Sturgeon, *Defect in Discovery and Testing Procedures: Two Problems in the Medicolegal Application of Blood Grouping Tests,* 5 U.C.L.A. L. Rev. 629–639 (1958).

La American Bar Association y la American Medical Association llevaron a cabo un estudio conjunto sobre la cuestión que nos ocupa que se denomina *Joint AMA–ABA Guide-*

*lines: Present Status of Serologic Testing in Problems of Disputed Parentage,* publicado en 1 Fam. L.Q. 247 donde se recomienda que se legisle con el fin de reglamentar la toma y análisis de sangre y su presentación en evidencia, incluyendo el valor evidenciario de las que establecen la posible paternidad.

■ Hasta que la Asamblea Legislativa actúe sobre esta cuestión, en cualquier acción en la que la paternidad sea un hecho pertinente, el tribunal puede, a iniciativa propia, y deberá a moción de parte oportunamente presentada, ordenar a la madre, hijo o hija y al alegado padre a someterse a exámenes de sangre. Los exámenes deberán ser hechos por peritos, debidamente calificados, nombrados por el tribunal. Antes de admitirse en evidencia el tribunal se cerciorará que los exámenes se han llevado a cabo siguiendo las más estrictas normas exigidas para esta clase de análisis.

Habiéndose presentado en este caso el resultado de dos análisis dignos de crédito, llevados a cabo por dos laboratorios de reconocida probidad y competencia profesional que demuestran que el demandado no puede ser el padre, *se dejará sin efecto nuestra sentencia de 26 de mayo de 1977 y se dictará otra revocando la dictada por el Tribunal Superior, Sala de San Juan, Juliá, J. que declaró con lugar la demanda radicada en este caso.*

El Juez Asociado Señor Rigau concurre en el resultado. El Juez Asociado Señor Díaz Cruz concurre en parte y disiente en parte en opinión separada.

—O—

Opinión disidente en parte y concurrente en el resultado del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 16 de febrero de 1979

El 25 de noviembre de 1974 la Sala de San Juan del Tribunal Superior dictó sentencia en pleito de filiación, decla-

rando al menor Juan Almeido hijo del demandado Juan Francisco Peña y de su ex-cónyuge Minerva Ortiz. Fundó su sentencia en las siguientes determinaciones de hecho:

"La demandante Minerva Ortiz estuvo casada con el demandado Juan F. Peña, desde el 28 de marzo de 1965 hasta el mes de mayo de 1968, fecha en que se divorciaron.

Que con posterioridad al divorcio, la demandante y el demandado continuaron relacionándose personalmente e incluso sostuvieron relaciones sexuales, dando por consiguiente que con motivo de dichas relaciones, la demandante quedó en estado de embarazo, procreando al menor Juan Almeido, el cual fue inscrito como hijo natural de Minerva Ortiz, o sea la demandante, toda vez que el demandado se negó a reconocer a dicho menor.

Este Magistrado concluye, a tenor con la credibilidad que le merecen los testigos, que el demandado a pesar de haberse divorciado de la demandante, continuó las relaciones con ésta. La madre de la demandante, mujer de profundas convicciones religiosas, aseveró que el demandado visitaba a la demandante, se encerraban en la habitación de ésta e incluso para la fecha en que la demandante fue a dar a luz, el demandado la buscó en su automóvil y la llevó al hospital.

La demandante estableció con su testimonio, al cual da crédito el Tribunal que a la fecha en que quedó en estado, sólo había sostenido relaciones con el demandado, estableciendo con exactitud la fecha en que había tenido la regla, por ser la misma significativa, la cual recordaba con fidelidad.

El Tribunal sostiene que a base de su observación, el parecido físico entre el menor y el demandado es notable y significativo.

La prueba aportada por la parte demandada sobre exclusión de paternidad no es concluyente y así lo determina el Tribunal, véase *Arais* v. *Kalensnikoff*, 10 Cal.2d 428, 74 P.2d 1043, *Harding* v. *Harding*, 22 N.Y.S.2d 810 y 115 A.L.R. 163 y otros casos revelan la cuestión en armonía con la posición del Tribunal.

El laudable intento por parte del demandado ha resultado fallido en contrarrestar la preponderancia de la evidencia aportada y creída por el Tribunal. El Tribunal determina y resuelve que Juan F. Peña es el padre del menor Juan Almeido Peña, a tenor con la totalidad de la prueba que ha tenido ante sí y la credibilidad que le han merecido los testigos."

Al recurrir el demandado le concedimos por resolución de 22 de enero de 1975 tiempo necesario para elevar la transcripción del testimonio oral del perito médico Dr. Rafael Córdova Márquez, profesor de hematología de la Universidad de Puerto Rico quien presentado como testigo por el demandado declaró haber practicado una prueba de sangre que a su juicio excluía la paternidad. Se nos sometió dicha transcripción, y considerada la misma, el 17 de abril de 1975 se desestimó con "no ha lugar" la solicitud de revisión. A moción de reconsideración que entre otros argumentos aduce que "este caso es de vital importancia para un([1]) ser humano" el 7 de mayo de 1975 ordenamos ampliación de vista en instancia para que el juez oyera al demandado, quien no declaró en el juicio. Celebrada la vista resolvió la sala de instancia el 4 de junio de 1975: "Oída la declaración del recurrente, observada su conducta y forma de declarar, analizada dicha declaración cuidadosamente, no encontramos razón alguna que nos lleve a apartarnos de las conclusiones a que llegamos en nuestra sentencia de 25 de noviembre de 1974."

El 19 de junio de 1975 expedimos auto de revisión y sometido el pleito con su récord taquigráfico, el 14 de octubre de 1976 este Tribunal dictó sentencia en la que luego de relatar las principales conclusiones del juzgador, dijimos: "Ante determinaciones de hecho tan firmes hechas por el magistrado que vio y oyó declarar a los testigos, no creemos que debemos intervenir con su fallo. Se confirma la sentencia recurrida." Solicitó reconsideración el demandado basado en el superior valor probatorio de la prueba sanguínea que excluye la paternidad y decidimos oír las partes en vista oral que fue celebrada el 17 de enero de 1977. El 26 de mayo de 1977 desestimamos la reconsideración por error inexplicado en el nombre del niño objeto de la prueba de sangre, pero el 2 de septiembre de 1977 dejamos esta segunda sentencia sin efecto y auto-

---

([1])Lo es, no sólo para el demandado, sino para el hijo menor de edad y su señora madre.

rizamos a la sala de instancia a considerar una moción del demandado a tenor de la Regla 49.2 de Procedimiento Civil, donde quedó aclarada la confusión de nombres estableciéndose que la prueba se realizó con sangre del menor Juan Almeido, demandante en filiación. En mayo de 1978 quedó el pleito sometido para decisión en sus méritos.

El resultado de la prueba hematológica en los casos de paternidad no es valor absoluto e incuestionable. Como toda evidencia debe superar la impugnación de la parte contra quien se produce y satisfacer la conciencia del juzgador en la estimación total de la prueba presentada en el caso. Atribuir una calidad de absoluta e intocable a esta prueba técnica tiene el efecto de negar el derecho constitucional de toda parte a confrontarse con la prueba en su contra, y de negar asimismo la progresiva evolución de la investigación científica que en no pocas ocasiones rechazará mañana lo que hoy tenemos como verdad axiomática. Negar consideración y ponderación judicial a la prueba del hijo equivale a negar vista. *Cf. Casanovas & Cía.* v. *Soltero,* 61 D.P.R. 653 (1943).

Los proponentes de la incontestabilidad de esta prueba científica sólo exigen que para su admisión se cerciore el juez de que en el laboratorio se siguieron el método y los pasos que el criterio científico hasta hoy instruye deben seguirse. La confiabilidad del análisis está minado de imponderables. [2] Los errores pueden ser producto de la dificultad del laboratorio para conseguir el antisuero con la concentración y clasificación debidas; pueden deberse a la presencia de anticuerpos bloqueantes en el suero sanguíneo, ocasionados por transfusiones o por embarazo; a no seguirse los métodos de prueba recomendados por los fabricantes del antisuero utilizado; también pueden deberse a que el técnico de laboratorio no capte correctamente el proceso de aglutinación, bien por ineptitud o inatención particularmente en la prueba de clasifica-

---

[2] R. Gray, *Attorneys' Textbook of Medicine,* 3ra. ed., Vol. 4B, secs. 304.08–13.

ción de sangre según el factor Rh; o a la poca destreza de la persona que la realiza.

¿De quién va a depender el juzgador para escudriñar esta evidencia científica y llegar a la conclusión de su infalibilidad? ¿Va a depender del propio analista que realizó la prueba en la esperanza de que admita error si lo hubo, o va a imponerle al hijo negado la contratación de costosos peritos que puedan encontrar error en la prueba practicada?

Nuestro sistema adversativo de enjuiciamiento se caracteriza por igual oportunidad de ser oídas todas las partes. Es flagrante transgresión de esta garantía constitucional la negativa de un juez a considerar, evaluar y ponderar la evidencia que le ofrece una parte, simplemente porque una prueba científica ha paralizado su función de juzgar y su arbitrio de aquilatar la prueba, no importa el alto grado de confiabilidad de la evidencia opuesta como lo son admisiones expresas o implícitas de paternidad por el padre putativo.

No es cuestión de trasladar del juzgado al laboratorio la eminente función de decidir las controversias judiciales. Al juez, y no al analista o técnico de laboratorio, le estará siempre reservada la decisión final. En el justo y bien balanceado proceso judicial no hay evidencia que pueda suprimir su arbitrio para estimar la que se le opone. Quien hace descansar la certeza inexpugnable del dictamen de laboratorio en la comprobación por el tribunal de haberse seguido el procedimiento correcto en el análisis de las muestras de sangre, olvida que la presentación por el hijo que reclama filiación de prueba robusta y convincente como admisión expresa o implícita de la paternidad por el demandado, puede ser indicio de error en el examen técnico, y es circunstancia vital a ser apreciada por el juzgador.

La admisión en evidencia en casos de paternidad, de la llamada prueba hematológica que hasta ahora sirve para excluir aun cuando no para afirmar la relación paterno-filial no plantea problema siempre que no se la revista de carácter

de *definitiva* y *final*, elevándola a categoría de verdad revelada y de dogma intocable, una vez cerciorado el tribunal de que se ha seguido un método aceptable en el laboratorio. Esto equivale a supeditar el valor probatorio del análisis, a la mecánica seguida por el analista. El resultado sería una esciente violación al debido proceso y al derecho de toda parte a confrontarse con la prueba en su contra.

El progreso de la ciencia no tiene una ruta de infalible consistencia, pues siendo actividad del hombre cae en error y vuelve a levantarse en su busca de la verdad total, tan inalcanzable como el Santo Graal o la piedra de la filosofía. La prueba hematológica cuyas conclusiones nos merecen respeto hoy, aun con su insuficiencia para afirmar paternidad, puede que mañana sea rechazada a la luz de nuevos descubrimientos en el campo de la genética donde la actividad científica es particularmente intensa.

Dicha prueba, como cualquier otra evidencia, debe someterse al escrutinio judicial, a la impugnación y refutación por la parte contra quien se presenta. ¿Qué proceso judicial tendríamos en los casos de paternidad si un juez, atado por este Tribunal a la santidad de un análisis de laboratorio, no pudiera ejercer su arbitrio para descartar el examen y fallar según su consciencia y recto sentido porque se ha presentado evidencia abrumadora que establece la filiación, como cartas del demandado en que la admite, retratos dedicados a su hijo, un largo comportamiento con múltiples demostraciones del estado de hijo natural en que ha tenido al demandante, y hasta el reconocimiento por el padre en el acta de nacimiento o en testamento y por añadidura un notable parecido físico?

Nuestro Derecho, tanto en su legislación como en su jurisprudencia, ha negado consistentemente carácter de infalibilidad a la evidencia científica. Ordena el Art. 162 de la Ley de Evidencia (32 L.P.R.A. sec. 1679) que el efecto de la evidencia no es arbitrario, sino que se ejercerá con *discreción jurídica;* que el tribunal no está obligado a decidir de conformi-

dad con las declaraciones de cualquier número de testigos que no llevaren a su ánimo la convicción contra otra evidencia que le convenciere; y que la evidencia deberá estimarse no sólo por su valor intrínseco sino también con arreglo a la prueba que una parte estuviere en aptitud de presentar. Y el Art. 20 de la Ley (32 L.P.R.A. sec. 1663) dispone que un testigo podrá ser oído sólo bajo juramento o afirmación, y en un juicio sólo en presencia de todas las partes y sujeto al examen de éstas si tienen a bien asistir y examinar. Nuestra jurisprudencia ha sido consistente en la garantía de debido proceso que se cumple en el libre ejercicio de la facultad estimativa *de toda la prueba* por el juzgador. Veamos:

"Consistentemente hemos resuelto que ningún Tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito . . . y que todo Tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte técnicamente correcta." (Citas.) *Prieto* v. *Maryland Casualty Co.,* 98 D.P.R. 594, 623 (1970).

"No obstante, el recurrente produjo el testimonio pericial de un ingeniero, al efecto de que técnicamente era absolutamente imposible el que la luz verde estuviera verde a la vez en direcciones contrarias. Respetamos el testimonio pericial, pero una prueba en el récord que convence demostró que de hecho, esa era la situación allí al ocurrir el accidente. Quizás, una jugarreta de esas que a veces la máquina le hace al hombre a pesar de la técnica." *Pereira* v. *E.L.A.* 91 D.P.R. 750, 753 (1965).

"Sabido es que los tribunales de instancia, como este Tribunal en ejercicio de su facultad revisadora, tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aun, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta." (Citas). *Valldejuli Rodríguez* v. *A.A.A.,* 99 D.P.R. 917, 921 (1971).

"La intervención de los peritos no constituye un juicio sino solo un dictamen." Scaevola, citado con aprobación en *Pereira* v. *I.B.E.C.,* 95 D.P.R. 28, 54 (1967).

La más reciente confirmación de la facultad del juez para resolver de acuerdo con la prueba que convence su consciencia

aparece en *Alonso García* v. *Comisión Industrial*, 103 D.P.R. 712, 714 (1975).

No es éste el caso, sin embargo, donde debamos remitirnos sin mayor esfuerzo a la apreciación de la prueba por el juez de instancia. El examen serohematológico, cuando excluye la paternidad constituye evidencia respetable, producto del quehacer científico del hombre y reflejo de la verdad relativa hasta donde haya podido arrancarla de los misterios de la genética. El valor probatorio de esta prueba de sangre es considerable, especialmente cuando, como ocurre en el presente caso, dos laboratorios distintos, ambos de reconocida competencia e integridad, coinciden en el criterio excluyente de paternidad. El otro examen determinó la absolución del demandado en el caso criminal por abandono de menores. Evidencia de tal calidad y grado, sólo puede ser superada por otra que en su fuerza persuasiva incline la mente no prevenida a descartar de un todo la evidencia científica.

Consideramos que la sala de instancia no le dio el peso debido a esta prueba serohematológica ratificada, cuya confiabilidad estimamos prepondera sobre los testimonios orales de la señora madre y abuela del niño, susceptibles a emociones y pasiones que no alcanzan la probeta del analista.

Con estos antecedentes y fundamentos la sentencia recurrida sería revocada.