ARIEL ARROYO, demandante y recurrente, *v.* RATTAN SPECIALTIES, INC., ETC., demandados y recurridos.

*Número:* R-84-79 *Resuelto:* 5 de marzo de 1986

---

36

38

*Juana Caballero Roldán,* de Servicios Legales de P.R., Inc., abogada del recurrente; *Federico Calaf Legrand* y *Reichard, Colberg & Calaf,* abogados de los recurridos.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El 13 de septiembre de 1983 el demandante recurrente Ariel Arroyo presentó ante el Tribunal Superior, Sala de Caguas, una demanda jurada contra Rattan Industries, Inc., su Presidente, René López Duprey y su Vicepresidente, Ferdinand E. Sánchez Martínez, en la cual solicitaba sentencia declaratoria, *injunction* preliminar, *injunction* permanente y daños y perjuicios. En dicha demanda alegó que trabajaba para la codemandada como ebanista y devengaba "un salario de $3.60 la hora, a razón de ocho (8) horas diarias"; que era "padre de familia y el único proveedor de sustento para su esposa y tres hijos menores de edad", y que la codemandada Rattan Industries, Inc. era una empresa que se dedicaba, entre otras cosas, a la manufactura de muebles; que el 21 de junio de 1983 "fue suspendido de empleo y sueldo por una semana por el [codemandado] René López Duprey, por negarse a tomar un examen de polígrafo"; que el "25 de agosto de 1983 el [codemandado] Ferdinand E. Sánchez Martínez [lo] suspendió de empleo y sueldo por tres semanas . . . por

. . . volver[se] a neg[ar] a tomar un examen de polígrafo";
que en ese momento se encontraba suspendido de empleo y
sueldo, y que "debe[ría reintegrarse] a [su] trabajo el . . .
15 de septiembre de 1983". También alegó que cuando fue re-
clutado en el 1974 no era una condición del empleo el que con-
sintiera a someterse al examen de polígrafo y que "[e]l exa-
men de polígrafo es un método de cuestionable certeza cien-
tífica, utilizado para alegadamente establecer la veracidad o
mendacidad de la respuesta" de la persona que se somete al
examen.

El Reglamento de la codemandada Rattan Industries,
Inc., Tópico XXXIII sobre Normas de Disciplina, Regla 41
disponía:

> Negarse a tomar examen de polígrafo periódico o especí-
> fico:
>
> PRIMER PASO—Una semana de suspensión.
>
> SEGUNDO PASO—Si al regresar de la suspensión se
> niega de nuevo a tomar el examen, tres (3) semanas de sus-
> pensión.
>
> TERCER PASO—Si al regresar de la segunda suspensión
> se niega de nuevo a tomar el examen, separación definitiva.

A la luz de estos hechos, el demandante solicitó, entre
otros remedios, que se declarara la Regla 41 "contraria a [la
ley] y al derecho del demandante a la inviolabilidad de su
cuerpo, a la dignidad e integridad moral y a no ser expuesto
a vejámenes y humillaciones"; se dictara un *injunction* pre-
liminar para ordenar a los demandados que cesaran y desis-
tieran "de su intención [de someter] al demandante al . . .
examen de polígrafo" y de implantar el tercer paso de la
Regla 41; se dictara un *injunction* permanente para ordenar
a los demandados que cesaran y desistieran de "su práctica
unilateral, de someter al demandante al examen de polígrafo
o a cualesquiera otro examen físico con el propósito de obtener
información, como . . . condición para su permanencia en el
empleo"; y que se condenara a los demandados a compensar

al demandante por los daños económicos y por concepto de las angustias morales sufridas como consecuencia de las suspensiones.

Luego de una serie de trámites procesales, el demandante presentó dos demandas enmendadas y juradas, sustancialmente iguales a la demanda original. Una, el 20 de octubre de 1983, en la cual añadió a Rattan Specialties, Inc. como demandada y otra, el 10 de noviembre de 1983,(1) en la cual alegó que se reintegró a su trabajo el 15 de septiembre de 1983; que el 9 de noviembre de 1983, el codemandado Ferdinand E. Sánchez Martínez le requirió que se sometiera al examen del polígrafo, a lo cual se negó, y como consecuencia de esta negativa fue despedido por los demandados.(2)

■ El 23 de noviembre de 1983, luego de celebrar la vista sobre el *injunction* preliminar, el tribunal dictó sentencia que desestimó la demanda por "no aduc[ir] causa de acción alguna que justifique la concesión de un [remedio]"; ya que de la segunda demanda enmendada surgía "claramente que el reclamante no [tenía] derecho alguno en ley a los remedios que solicita[ba]". Es de esta sentencia que el demandante recurre ante este Tribunal.(3)

---

(1) El demandante tituló tanto la demanda enmendada presentada el 20 de octubre de 1983 como la presentada el 10 de noviembre de 1983, simplemente "Demanda Enmendada". Queremos indicar que ésta no es la mejor práctica, ya que tiende a confundir y dificulta el poderse referir con claridad a cualesquiera de ellas. El título con que se designe cada documento sometido a un tribunal debe distinguirse y diferenciarse para facilitar su identificación.

(2) Fue en la segunda demanda enmendada que el demandante solicitó que se dictara una orden de entredicho provisional para exigirle a los demandados "que lo reinstalar[a]n en su empleo, . . . que ces[aran] de su intención y/o de sus actos de obligar[lo] a someterse al examen de polígrafo hasta que se dilucid[asen] las controversias planteadas y se celebr[ase] la vista del Injunction Preliminar". El 14 de noviembre de 1983 el tribunal dictó orden de entredicho provisional y señaló para el 23 de noviembre de 1983 la vista del *injunction* preliminar.

(3) Esta sentencia se tituló "Proyecto de Sentencia Sumaria". Queremos una vez más reiterar lo que expresáramos en *Malavé* v. *Hosp. de la*

# I

*Controversias planteadas*

Nos corresponde hoy en este pleito analizar, dentro del contexto de la relación obrero-patronal, el ámbito y contorno de los derechos a la intimidad y a la dignidad del ser humano, y a estar protegido contra riesgos para su integridad personal en el trabajo, consagrados en el Art. II, Secs. 1, 8 y 16 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. Debemos hacer un balance entre estos derechos del individuo y el derecho del patrono al disfrute de su propiedad garantizado por el Art. II, Sec. 7 de la Carta de Derechos.

En su alegato, los demandados plantean que por tratarse de una empresa privada, el Art. II, Sec. 7 de la Constitución les garantiza el uso y pleno disfrute de su propiedad y que esta "protección constitucional sería letra muerta si como corolario no tuviese[n] un derecho claro de evitar que su propiedad y hacienda sufra daño, menoscabo, o sea apropiada por actos deshonestos de sus empleados, y en el ejercicio de ese derecho puede[n] emplear aquellos medios lícitos a su alcance que les ayuden a detectar la verdad o mentira de lo que un empleado les informa sobre sus actividades en el trabajo en el curso ordinario de su empleo para su patrono". Arguyen también que el derecho de propiedad de un patrono les permite exigir de sus empleados que le informen y rindan cuentas sobre sus actividades en el curso de su trabajo y que tienen derecho a utilizar "medios lícitos de corroboración exter-

---

*Concepción*, 100 D.P.R. 55 (1971), y *Román Cruz* v. *Díaz Rifas*, 113 D.P.R. 500, 508 (1982): los "proyectos de sentencia, utilizados correctamente, alivian la pesada carga que llevan nuestros jueces, ya que les sirven como punto de partida o como papeles de trabajo (*working papers*) en la confección de la sentencia que finalmente emiten". Sin embargo, constituye práctica indeseable " 'firmar a ciegas' dichos proyectos de sentencia", sin siquiera tomar en cuenta que la sentencia que firman lleva el título de "Proyecto de Sentencia Sumaria".

nos e independientes del empleado que suministra la información para asegurarse que lo que se les dice [por el empleado] es lo cierto y correcto".

Alegan, además, que de constituir el despido del Sr. Ariel Arroyo un despido injustificado éste sólo tendría derecho al remedio que le confiere la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a y ss.; pues "la responsabilidad civil en que incurre un patrono al despedir un empleado sin justa causa está limitada a la compensación que fija la citada ley".

El mecanismo de corroboración utilizado por los demandados en este caso fue la prueba del polígrafo, por lo que resulta importante para el análisis de las cuestiones constitucionales planteadas, que se entienda no sólo el funcionamiento de este instrumento, sino también la evaluación que lleva a cabo el técnico que suministra la prueba.

## II

### La prueba del polígrafo

■ El polígrafo es un instrumento que mide reacciones del sistema nervioso autonómico de una persona bajo situaciones controladas. Dicho instrumento registra cambios en la presión sanguínea, respiración, pulso y la reacción galvánica cutánea. (4) La prueba del polígrafo comienza con una entre-

---

(4) L. Burkey, *The Case Against the Polygraph*, 51 A.B.A.J. 855 (1965); Congress of the United States, Office of Technology Assessment, *Scientific Validity of Polygraph Testing, A Research Review and Evaluation*, U.S. Government Printing Office, noviembre de 1983.

Para que el resultado de la prueba sea confiable, es preciso que la persona a ser examinada esté en condiciones físicas y mentales apropiadas. Esto es así, porque las condiciones físicas y sicológicas de una persona pueden afectar las reacciones fisiológicas que se van a medir mediante el polígrafo. Para la confiabilidad de la prueba, también es necesario que la persona se someta voluntariamente al examen, pues sólo con la más completa cooperación de la persona a quien se le está administrando la prueba puede el técnico formar una opinión "experta" sobre la presencia o ausencia de engaño o falsedad en sus respuestas.

vista entre el técnico del polígrafo y la persona que va a ser sometida a la prueba. Los propósitos de esta entrevista son obtener información sobre la persona que será examinada, y convencerla de que la prueba del polígrafo es confiable. De esta forma se trata de lograr su más completa cooperación y evitar que mienta. La información obtenida en la entrevista será utilizada más tarde por el técnico durante el examen para formular preguntas *irrelevantes* y de *control*(5) que miden la reacción fisiológica de la persona cuando ésta miente y cuando es veraz. Congress of the United States, Office of Technology Assessment, *Scientific Validity of Polygraph Testing, A Research Review and Evaluation,* U.S. Government Printing Office, noviembre de 1983; R. Lowe, *Regulation of Polygraph Testing in the Employment Context: Suggested Statutory Control on Test Use and Examiner Competence,* 15 U.C.D. L. Rev. 113, 124–126 (1981).

■ El polígrafo opera bajo la teoría de que un individuo refleja ciertas características fisiológicas predecibles cada vez que miente intencionalmente. No es, por lo tanto, técnicamente un detector de mentiras, ya que no puede indicar directamente si la persona que se somete a la prueba está min-

---

(5)Los tipos de preguntas que generalmente se utilizan para la prueba del polígrafo han sido clasificadas como: (1) *irrelevantes* —son aquellas que deben producir poca o ninguna reacción porque se refieren a hechos conocidos no relacionados con el asunto que está bajo investigación— estas preguntas están diseñadas principalmente para obtener la base normal fisiológica para determinar las contestaciones veraces bajo las condiciones del examen; (2) *relevantes o críticas* —son preguntas que van dirigidas a determinar el conocimiento que tiene la persona sobre el asunto que se está investigando; (3) *control* —estas preguntas se diseñan en la entrevista preliminar que se lleva a cabo entre el técnico y la persona que va a someterse a la prueba del polígrafo y se basan en falsedades, su propósito es obtener un ejemplo de la reacción fisiológica de la persona cuando miente. *Scientific Validity of Polygraph Testing, A Research Review and Evaluation, op. cit.,* Cap. 2; D. Nagle, *The Polygraph in the Workplace,* 18 U. Rich. L. Rev. 43, 54–58 (1983).

tiendo o es veraz. (⁶) Es el técnico que administra la prueba el que interpreta las reacciones de la persona y determina si mintió o dijo la verdad. (⁷)

■ La subjetividad de la evaluación que hace este técnico sobre la veracidad o mendacidad de una respuesta, (⁸) combi-

---

(⁶) Burkey, *op. cit.*, pág. 856 n. 9; *Use of Polygraph as "Lie Detectors" by the Federal Government: Hearings Before the Subcomm. of the House Comm. on Government Operations*, 88th Cong., 1st Sess., pt. 1, pág. 8 (1964).

(⁷) En *Thorne* v. *City of El Segundo*, 726 F.2d 459, 469–470 (9no Cir. 1983), en el área gubernamental y en relación con el uso del polígrafo para solicitantes al cuerpo de la Policía, el Tribunal determinó que violaba la Ley de Derechos Civiles Federal de 1871 (42 U.S.C. sec. 1983), el que se le exigiera al solicitante que se sometiera a la prueba del polígrafo como condición de empleo. En este caso no se habían establecido normas, guías, definiciones o limitaciones y se dependía de lo que el técnico del polígrafo estimase que en su opinión era relevante para el empleo en cada caso en particular. Este tipo de delegación a un técnico o "experto" no se puede legitimar. Allí se dijo:

*"No se le puede exigir a una persona que para poder obtener el beneficio de un empleo con el Estado renuncie a sus derechos constitucionales. . . .* Mientras más fundamentales sean los derechos que queden afectados por las actividades del Estado, mayor ha de ser el interés del Estado en seguir el curso de acción trazado. . . .

. . . . . . . .

"Dada la total carencia de criterios para efectuar la evaluación, no podemos legitimar en este caso la búsqueda de 'desviaciones pervertidas' por parte del demandado. El riesgo de justificar, a base de un prejuicio contra o desaprobación individual de la conducta protegida, la violación de un derecho importante constitucionalmente protegido, es demasiado grande. El propósito mismo de la protección constitucional de las libertades individuales es el impedir esta coacción mayoritaria y caprichosa . . . ('podría decirse con toda justicia que la Carta de Derechos en general, y la Cláusula de Debido Proceso en particular, fueron diseñadas para proteger los frágiles valores de una ciudadanía vulnerable, contra la exagerada preocupación por la eficiencia y eficacia característica de funcionarios gubernamentales encomiables, no menos, y tal vez más, que de funcionarios mediocres.')." (Citas omitidas, traducción nuestra y énfasis suplido.)

(⁸) En *Hester* v. *City of Milledgeville*, 598 F. Supp. 1456, 1475 (C.D. Ga. 1984), se dijo que el resultado de la prueba del polígrafo no era otra cosa que la opinión personal del técnico del polígrafo sobre la manera veraz o falaz en que la persona interrogada respondió durante la entrevista preliminar y durante la sesión de preguntas y respuestas hechas mientras las registra el instrumento del polígrafo.

nada con la falta de entrenamiento adecuado, experiencia y competencia de muchos de ellos (⁹) y la ausencia de sumisión voluntaria real de parte del obrero que está siendo examinado, hacen altamente cuestionable la confiabilidad de la prueba.

## III

*La prueba del polígrafo en la relación obrero-patronal*

■ En la relación obrero-patronal, el polígrafo se utiliza con varios propósitos: para determinar veracidad cuando se está investigando algún incidente o asunto específico (prueba específica); para detectar algún incidente sobre el cual el patrono no tiene conocimiento aún o como mecanismo para evitar o desalentar el hurto o el mal uso de la propiedad del patrono (prueba periódica); (¹⁰) o para tratar de predecir la conducta futura del trabajador, empleado o solicitante. (¹¹)

---

(⁹) En Puerto Rico no existe ley o reglamentación que asegure que todo técnico de polígrafo tenga por lo menos una competencia mínima que lo capacite para suministrar una prueba de polígrafo que pueda resultar confiable. Se ha dicho que en Estados Unidos el 80% de los técnicos que administran pruebas de polígrafos no están cualificados para administrar estas pruebas. Burkey, *op. cit.*, pág. 856; *Use of Polygraphs as "Lie Detectos" by the Federal Government* (testimonio de Fred Inbau), *op. cit.*, pt. 1, pág. 8.

(¹⁰) La teoría de los patronos usualmente es que el empleado no incurrirá en conducta delictiva si sabe que mediante el uso periódico de la prueba del polígrafo el patrono podrá detectar prontamente la falta cometida.

(¹¹) El instrumento del polígrafo en sí no registra mentiras o siquiera el estado fisiológico que acompaña el mentir. Lo que hace es medir cambios generados por tensión emocional (*emotional stress*). Esta tensión puede ser causada por mentir o por el miedo de que la inocencia no sea probada o por coraje al ser sospechoso o por cualquier otro estímulo diferente. Más aún, el mentir no resulta en un sentido de culpabilidad, miedo o ansiedad en todas las personas; en algunas resulta en satisfacción, aburrimiento o cualquier estado libre de tensión. Por lo tanto, mientras algunas personas inocentes pueden ser falsamente acusadas por el detector de mentiras, otras culpables pueden resultar inocentes (*beat it*). M. Coghill y E. Gruenfeld, *The Lie Detector in Employment*, 2 Key Issues Series 11 (Rev. 1973). N.Y.

Los patronos utilizan los resultados de estos exámenes para, entre otras cosas, despedir al empleado, negarle un ascenso o beneficio, o no emplear a una persona que solicita trabajo.

Algunos expertos opinan que el polígrafo no es un instrumento apropiado para utilizarse en relación con las pruebas periódicas o para predecir comportamiento; que sólo es adecuado, bajo ciertas circunstancias, para investigar incidentes específicos. [12] J. Reid y F. Inbau, *Truth and Deception*, 2da ed., Baltimore, Ed. Waverly Press, 1978; D. Nagle, *The Polygraph in the Workplace*, 18 U. Rich. L. Rev. 43 (1983).

■■■ Durante la prueba del polígrafo al obrero se le pueden hacer preguntas no relacionadas con el asunto que está bajo investigación o con los intereses legítimos del patrono, preguntas impropias que invaden su intimidad. [13] El técnico, durante la entrevista preliminar y al dar la prueba, puede preguntar, por ejemplo, sobre aquellos asuntos que al patrono le interese saber la reacción o el parecer del obrero y

---

State School of Industrial and Labor Relations, Cornell University. "Como cuestión de hecho cualquier palabra que dé la casualidad que tenga una fuerte connotación emocional para un individuo y que sea incluida en una pregunta crítica puede producir una reacción que puede ser erróneamente interpretada como una mentira". (Traducción nuestra.) B. Smith, *The Polygraph*, Scientific American 25, 30 (enero 1967). Véase también B. Kleinmuntz, *Trial by Polygraph*, 21 Trial 32, 34 (Núm. 9 de 1985).

[12] Cuando no se está investigando algún incidente en específico, como sucede con la prueba periódica o con la que se le suministra a un solicitante para empleo o ascenso, resulta difícil confeccionar preguntas sencillas, precisas y específicas, que contengan sólo un elemento, como se requiere para que la persona a quien se le somete a la prueba pueda contestar simplemente en la afirmativa (sí) o en la negativa (no). Esta manera de formular preguntas es indispensable para que las reacciones que el instrumento del polígrafo mide reflejen correctamente la posición de la persona a quien se evalúa con respecto al contenido de cada pregunta.

[13] La American Civil Liberties Union objeta a estas pruebas, porque se pueden hacer preguntas que invaden la intimidad del individuo, estiman que hay otras maneras de cotejar o comprobar veracidad que son menos intrusivas. V. Quade, *Use of Honesty Test Raises Privacy Issue*, 68 A.B.A.J. 671 (1982).

sobre los cuales el obrero normalmente no vendría obligado a informar; asuntos tales como su conducta pasada relacionada con actividades gremiales[14] o políticas, sus preferencias sexuales, creencias religiosas o conducta delictiva ocurrida en tiempos remotos o conducta de alguna naturaleza que a la persona no le interese divulgar. Debido a que el polígrafo registra las reacciones fisiológicas de la persona aunque ésta rehúse o se niegue a contestar, la persona que es sometida a la prueba del polígrafo no puede decidir qué preguntas contesta y qué preguntas se niega a contestar. Esto distingue y claramente diferencia la prueba del polígrafo de un cuestionario o interrogatorio, donde la persona puede objetar o no contestar las preguntas que por su contenido no son pertinentes o invaden áreas protegidas. La prueba del polígrafo interviene directamente con los pensamientos y las ideas de la persona y ésta no tiene control sobre lo que divulga, aunque permanezca callada.[15] Nagle, *op. cit.;* Lowe, *op. cit.;* A. Westin, *Privacy*

---

[14] En determinadas circunstancias, y como regla general, el uso del polígrafo con obreros unionados podría constituir práctica ilícita del trabajo, pues podría considerarse una acción concertada para discriminar en el empleo debido principalmente al posible contenido de las preguntas. C. Craver, *The Inquisitorial Process in Private Employment,* 63 Cornell L. Rev. 1, 9 (1977).

[15] En Alemania, el tribunal de mayor jerarquía, dentro del contexto de un caso criminal, resolvió que las pruebas de polígrafo violaban la libertad del individuo para tomar sus propias decisiones y actuar de conformidad con su voluntad. De acuerdo con ese tribunal, estas pruebas le violaban al acusado su condición ética como una personalidad independiente moral. El tribunal expresó:

"Estos principios de derecho constitucional y de procedimiento criminal están cimentados en el hecho de que, al enfrentarse a la comunidad, aun un sospechoso o uno que merezca ser castigado se considera una persona moral independiente; al establecerse su culpa, éste puede y debe expiarla bajo la ley que ha sido violada; sin embargo, *más allá de tales restricciones estatutarias, no debe sacrificarse su personalidad al propósito público de combatir el crimen, aunque esto es sin duda muy importante."* (Énfasis suplido y traducción nuestra.) Sentencia de Bundesgerichtshof (I. Strafsenat), 16 de febrero de 1954, 5 Entscheidungen des Bundesgerichtshofes in Strafsachen 332, 334. Según citado en H. Silving, *Testing of the Unconscious in Criminal Cases,* 69 Harv. L. Rev. 683, 688, 689 (1956).

*and Freedom,* Nueva York, Ed. Atheneum, 1967, págs. 239–240; B. Stack, *Polygraphs and Privacy, Statutory Intervention is Needed to Protect Private Worker's Rights,* 59 Fla. B. J. 19, 20 (1985).

■ Recientemente, en Estados Unidos, se ha desarrollado la práctica de condicionar la obtención o retención de un empleo o trabajo a que la persona se someta a pruebas de polígrafo.([16]) Esta práctica ha tomado gran auge, tanto en las empresas privadas([17]) como en la esfera gubernamental.([18])

---

La Constitución de la República Alemana de Bonn dispone:

"La dignidad del ser humano es inviolable. Toda autoridad estatal tiene el deber de respetarla y protegerla." Art. I, Sec. 1.

Sobre este particular véase también, H. Kaganiec, *Lie-Detector Tests and "Freedom of the Will" in Germany,* 51 Nw. U.L. Rev. 446 (1956); H. Gutteridge, *The Comparative Law of the Right to Privacy—I The Law of Germany and Switzerland,* 47 L.Q. Rev. 203 (1931).

([16]) Varios comités congresionales que han investigado y estudiado el uso del polígrafo y los exámenes sicológicos en relación con empleados federales, han recomendado enérgicamente, como mecanismo para proteger a los empleados federales de intromisiones indebidas e innecesarias en su intimidad, que se apruebe legislación que reglamente o prohíba totalmente el uso de estas pruebas. *Hearings on Psychological Testing Procedures and the Rights of the Federal Employees, Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 89th Cong., 1st Sess. (1965); *Hearings on Special Inquiry on Invasion of Privacy, Before a Subcomm. of the House Comm. on Government Operations,* 89th Cong., 1st. Sess. (1965); *Hearings on Polygraph Control and Civil Liberties Protection Act, Before the Subcomm. on the Constitution by the Senate Comm. on the Judiciary,* 95th Cong., 1st & 2nd Sess. (1977–78).

([17]) Algunas de las razones que con más frecuencia se han aducido para explicar este auge son la necesidad que tiene el patrono de protegerse contra hurtos, la ayuda que estos mecanismos ofrecen para escoger las mejores personas para propósitos de empleo, retención o ascenso y lo relativamente poco costoso, rápido y efectivo que resulta implantar un sistema de pruebas de polígrafo. J. Reid y F. Inbau, *Truth and Deception,* 2da ed., Baltimore, Ed. Waverly Press, 1978; Nagle, *op. cit.;* Nota, *Lie Detectors in Private Employment: A Proposal for Balancing Interests,* 33 Geo. Wash. L. Rev. 932 (1965).

([18]) En el 1982, se sometió entre uno (1) a cuatro (4) millones de solicitantes y empleados a la prueba del polígrafo como condición para la obtención o retención del empleo. Se estima que el 30% de las quinientas (500) compañías más grandes de Estados Unidos con regularidad exigen a sus

Con estas pruebas se pretende auscultar el pensamiento de la persona y supuestamente verificar, de forma "objetiva", la veracidad de la información obtenida de los trabajadores o solicitantes a empleo, o predecir su conducta futura. [19]

En la actualidad hay veintisiete (27) estados que prohíben o limitan el uso del polígrafo dentro del contexto de la relación obrero-patronal, ya fuere como condición para obtener o retener un empleo [20] y dieciocho (18) estados que regulan la profesión de técnico de pruebas del polígrafo.

---

empleados que se sometan a estas pruebas. B. Stack, *Polygraphs and Privacy, Statutory Intervention is Needed to Protect Private Worker's Rights,* 59 Fla. B. J. 19, 20 (1985); S. Gardner, *Wiretapping the Mind: A Call to Regulate Truth Verification in Employment,* 21 San Diego L. Rev. 295, 296 (1984). Resulta verdaderamente impresionante que durante la última década el aumento en el uso del polígrafo en Estados Unidos en la esfera obrero-patronal ha sido tal, que el número de pruebas practicadas a empleados o solicitantes de empleo sobrepasa, por mucho, el número de las administradas en relación con investigaciones criminales realizadas por miembros de las fuerzas policíacas. Nagle, *op. cit.*

De otra parte, como resultado de las investigaciones congresionales sobre el uso del polígrafo y las interrogantes que han surgido sobre su confiabilidad en los círculos empresariales y en la mente del público en general, el Pentágono redujo drásticamente el número de pruebas del polígrafo y el Departamento de Defensa de Estados Unidos dejó de utilizarlo para vigilar a sus empleados y evaluar a los solicitantes. Coghill y Gruenfeld, *op. cit.*

[19] Las justificaciones que se han ofrecido para su uso han sido bastante variadas y cubren una amplia gama, desde la seguridad nacional y pública, hasta la necesidad de verificar la existencia de pillaje en una oficina, desalentar el hurto u obtener información que permita escoger al mejor candidato para un puesto o la concesión de algún beneficio. D. Hermann III, *Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing,* 47 Wash. L. Rev. 73 (1971); *Scientific Validity of Polygraph Testing, A Research Review and Evaluation, op. cit.; Privacy a Public Concern: A Resource Document* (Based on the Proceedings of a Seminar on Privacy Sponsored by the Domestic Council Committee on the Right of Privacy and the Council of the State Governments), U.S. Government Printing Office, agosto de 1975.

[20] Alaska, Tít. 23, Cap. 10, Sec. 23.10.037, Estatutos de Alaska, esta ley prohíbe que el patrono solicite o sugiera a un empleado o a una persona que está solicitando empleo que se someta a la prueba del polígrafo como condición de empleo, exceptúa de esta disposición a la Policía; la violación de esta sección constituirá un delito menos grave; California, Sec.

En Puerto Rico no existe reglamentación específica en esta área, aunque se encuentra ante la consideración de la Asamblea Legislativa un proyecto de ley encaminado a prohibir el uso del polígrafo en el contexto de las relaciones obrero-

432.2 del Código Laboral del Estado, Cap. 316, Ley de 2 de septiembre de 1981; Connecticut, Estatutos Generales de Connecticut, Tít. 31, Sec. 31-51g, esta ley define polígrafo como "cualquier tipo de instrumento o aparato mecánico o eléctrico que alegadamente se utilice para poner a prueba, examinar, o interrogar individuos con el propósito de determinar su veracidad" (traducción nuestra); Delaware, Tít. 19, Cap. 7, Sec. 705, Código de Delaware; Distrito de Columbia, Ley D. C. 2-154 efectiva 6 de marzo de 1979; Hawaii, Estatutos de Hawaii Revisados 1968, Tít. 21, Cap. 378, P. II, Secs. 378-21 y 378-22; Idaho, H. B. 204, Cap. 279, Leyes 1973, de 16 de marzo de 1973; Illinois, Sec. 2415.1, Cap. III, Estatutos de Illinois Revisados 1981, el estatuto prohíbe que se hagan preguntas del siguiente tipo en relación con un examen de polígrafo: "creencia o afiliación religiosa; convicciones u opiniones sobre asuntos raciales; convicción o afiliación política; creencia, afiliación o actividades lícitas con respecto a uniones u organizaciones obreras; o preferencias o actividades sexuales" (traducción nuestra); Iowa, H. B. 37, Leyes de 1983, de 6 de mayo de 1983; Maine, Sec. 7166, Cap. 87, 32 Estatutos Revisados Anotados de Maine, H. B. Núm. 91 de 11 de mayo de 1979, este estatuto permite que el empleado voluntariamente solicite que se le someta a la prueba del polígrafo, pero prohíbe que el patrono utilice los resultados del examen en contra del empleado, y requiere que al empleado se le dé una copia de la ley cuando solicita someterse a la prueba y que el examen sea registrado o que un testigo del empleado esté presente o ambas cosas; Maryland, Art. 100, Sec. 95, Código de Maryland Anotado, Vol. 1964, Supl. 1974, esta ley requiere que toda solicitud de empleo contenga el siguiente aviso: "Bajo la Ley de Maryland, el patrono no puede requerirle o exigirle a una persona que está solicitando trabajo, o a un empleado, que se someta a una prueba de polígrafo o detector de mentiras, o a cualquier prueba similar como una condición para darle el empleo o para que continúe en él. Cualquier patrono que viole esta disposición incurrirá en un delito menos grave y podrá imponérsele una multa no mayor de $100." (traducción nuestra); Massachusetts, Cap. 149, Sec. 19B, Leyes Generales; Michigan, Ley Núm. 44, Leyes de 1982, de 17 de marzo de 1982, esta ley define examen de polígrafo como "un examen para evaluar la tensión psicológica, o cualquier otro procedimiento que envuelva el uso de instrumentos o aparatos mecánicos que faciliten o ayuden a detectar el engaño, a constatar la veracidad, o a emitir un juicio diagnóstico sobre cualquiera de los siguientes: incluso una prueba de detector de mentiras, un examen para evaluar la tensión psicológica o cualquier prueba similar" (traducción nuestra); permite que un empleado o una persona que solicita empleo se someta voluntariamente a la prueba del polígrafo, aun así, bajo esta ley hay que informarle al empleado todas las áreas específicas sobre las cuales

patronales en la empresa privada, P. de la C. 582, de 19 de agosto de 1985.

Tampoco existen estadísticas sobre el uso del polígrafo en relación con el empleo, ya fuere en la industria privada o en

van a preguntar, que tiene derecho a rehusarse a tomar el examen, que puede parar el examen en cualquier momento, que no viene obligado a contestar o dar información, que cualquier información que dé puede ser usada en su contra, a menos que especifique lo contrario por escrito, y hay que proveerle al empleado una copia del examen y de todo informe o análisis que se haga por el técnico que administró el examen; Minnesota, Estatutos de Minnesota, Secs. 181.75 y 181.76, esta ley además de prohibir el uso del polígrafo en la relación obrero-patronal, provee para que se pueda obtener un remedio de *injunction* y daños; Montana, H. B. 787, Cap. 46, Leyes de 1974; Nebraska, *Licensing of Truth and Deception Examiner's Act*, Cap. 81, Art. 19, Ley Núm. 485 de 15 de abril de 1980, esta ley también prohíbe que se hagan preguntas sobre prácticas sexuales, uniones obreras o afiliaciones políticas o religiosas, o relaciones matrimoniales, requiere que se le informe al empleado oralmente y por escrito que el examen es voluntario y que puede pararlo en cualquier momento, el empleado tiene que firmar un formulario en el que dé su consentimiento al examen y las preguntas que se hagan tienen que estar relacionadas con el empleo; no se puede seleccionar a los empleados para darles el examen de una forma discriminatoria, el examen tiene que estar relacionado con alguna investigación específica y los resultados del examen no pueden ser lo único que determine su estado en el empleo; Nevada, Estatutos Revisados de Nevada, Tít. 54, Cap. 648A; Nueva Jersey, Estatutos de Nueva Jersey, Tít. 2C, Cap. 40A, este estatuto excluye de la prohibición a aquellos patronos que se dediquen a la manufactura, distribución o expendio de narcóticos o sustancias peligrosas controladas y dispone que una copia escrita del informe sobre los resultados del examen se le provea al empleado a petición de éste, y que la información obtenida a través del examen no se le suministrará a ningún otro patrono o persona; Nueva York, Cap. 30, Leyes de 1978, Ley Laboral, Art. 20-B, *Psychological Stress Evaluators and Employment*, Secs. 733 a 739; Oregon, Secs. 659.225 a 659.227 de los Estatutos Revisados de Oregon; Pennsylvania, Tít. 18, Sec. 7321 del Código Penal; Rhode Island, Tít. 28, Cap. 6.1 de las Leyes Generales; Utah, Código de Utah Anotado, Tít. 34, Cap. 34, Sec. 34-37-16; Virginia, Código de Virginia, Sec. 40.1-51.4:3; Washington, Código Revisado de Washington, Cap. 49, Secs. 44.120 y 44.130; West Virginia, H.B. 1212 de 26 de marzo de 1983, Secs. 21-5-5a a 21-5-5d, Cap. 21, Art. 5, las prohibiciones de esta ley no aplican a empleados de un patrono autorizado a la manufactura, distribución o expendio de drogas, o a las agencias encargadas del orden público o a las fuerzas militares del Estado, los resultados del examen sólo se pueden utilizar para emplear o continuar empleando a la persona y para ningún otro propósito; Wisconsin, *Fair Employment Act*, Cap. 334, Sec. 111.37.

la esfera gubernamental. Las pocas estadísticas disponibles demuestran que hubo cinco (5) querellas o consultas al Negociado de Normas de Trabajo del Departamento del Trabajo y Recursos Humanos, relacionadas con el uso del polígrafo.[21] Cabe señalar que en relación con los hechos que generaron las reclamaciones en este caso, el Departamento del Trabajo y Recursos Humanos emitió, el 19 de octubre de 1983, la Consulta Núm. 12296 sobre la legalidad de la Regla 41 del Reglamento de la codemandada Rattan Industries, Inc. Dicha consulta consideró que la Regla 41 era "contraria al orden público en esta jurisdicción, ya que la misma constituye una invasión a la privacidad [sic] del individuo".

## IV

*El derecho constitucional a la dignidad, integridad personal e intimidad del ser humano*

A pesar de que los avances tecnológicos y científicos usados correctamente pueden resultar de gran beneficio para la sociedad, no se puede perder de vista que éstos son susceptibles a ser mal utilizados y pueden convertirse en instrumentos para esclavizar al hombre y minar lo más preciado para el ser humano: su dignidad, integridad personal e intimidad. Hoy más que nunca debemos tener presente y acatar las palabras de advertencia que emitiera hace casi dos décadas el Juez Asociado Douglas en su disidencia en el caso de *Osborn* v. *United States*, 385 U.S. 323, 341–343 (1966), al comentar sobre el riesgo en que se encuentran estos valores en la sociedad moderna, y en la cual hizo alusión específica al uso del polígrafo:

Estamos entrando rápidamente en una época en que no existe la intimidad, donde todo el mundo está expuesto a la

---

[21] Véase Exposición de Motivos del P. de la C. 582, de 19 de agosto de 1985, *Para prohibir el uso del detector de mentiras (polígrafo) o de cualquier otro instrumento análogo por parte de patronos privados con relación a solicitudes o contratos y condiciones de empleo, y fijar penalidades.*

vigilancia todo el tiempo. . . . Es usual encontrar cabinas secretas de observación en las oficinas del gobierno, y televisión de circuito cerrado en la industria, y hasta en los baños. . . . *Las pruebas de personalidad intentan descubrir los pensamientos más íntimos del hombre sobre la vida familiar, la religión, actitudes raciales, origen, política, ateísmo, ideología, sexo, y cosas por el estilo. . . . Se ha generalizado la administración de pruebas de polígrafo a empleados del gobierno y de la industria. . . .* El historial personal de todos los ciudadanos ha aumentado en número y en tamaño. Actualmente se ponen en las computadoras de manera que con sólo apretar un botón se pueden identificar instantáneamente a todos los infelices, enfermos, sospechosos, marginados y excéntricos de la Nación. *Estos y muchos otros ejemplos demuestran una alarmante tendencia a aniquilar gradualmente la intimidad y dignidad de nuestros ciudadanos mediante medidas casi imperceptibles. Cada una de estas medidas tomadas individualmente puede que no tengan ninguna importancia, pero cuando se toman en su totalidad, vemos cómo está empezando a surgir una sociedad muy distinta a cualquiera que hayamos visto—una sociedad en que el gobierno podrá inmiscuirse a gusto en las regiones más secretas de la vida del hombre.* (Énfasis suplido y traducción nuestra.)

Vivimos en una época de transición donde la sensibilidad íntima de los pueblos y de las personas parece encontrarse bajo constante acecho. Los avances científicos y tecnológicos ocurren con tanta rapidez que producen crisis subitáneas y originan desviaciones momentáneas en el centro de gravedad de la conciencia pública. La función social de pequeñas y graduales renovaciones continuas para ajustar el Derecho y las leyes a los cambios se imposibilita ante la vertiginosa rapidez con que éstos se suceden. Esta actividad de osmosis y endosmosis con el medio ambiente se ha interrumpido, y las leyes y el Derecho han quedado a la zaga de esta transformación, que a veces amenaza con socavar los cimientos de las creencias y valores más arraigados de la sociedad.

■ La credibilidad y veracidad que la sociedad le otorga a los mecanismos científicos y a los técnicos o "expertos" que utilizan los desarrollos modernos, junto con la inherente curiosidad del ser humano por los asuntos de sus semejantes y la avidez que la sociedad ha demostrado por la recopilación y compilación de información, han convertido a nuestra sociedad en una de expedientes, altamente reglamentada,[22] donde la intimidad, dignidad e integridad personal del ser humano se encuentran cada día en mayor peligro de perderse o quedar intolerablemente limitadas o menoscabadas. Esto no se puede ni se debe permitir. Tenemos el deber de canalizar esta tendencia y los desarrollos tecnológicos y científicos, de forma tal que derivemos sus beneficios sin que se le aseste un golpe mortal a lo más preciado en la vida de todo ser humano en una sociedad democrática: su dignidad, integridad e intimidad.[23] Nuestra Constitución es guardadora de estos va-

---

[22] A. Miller, *The Dossier Society*, 1971 U. Ill. L. F. 154–167 (1971); M. Zavala De González, *Derecho a la Intimidad*, Buenos Aires, Ed. Abeledo-Perrot, 1982, pág. 15: "[E]s significativo el papel invasor y omnipresente del Estado, hasta en los aspectos más recónditos, erigido en enorme Leviatán, cuyo crecimiento se ve facilitado por el desarrollo y perfeccionamiento de la informática. Las computadoras almacenan millones de datos, y los más íntimos detalles de la vida de los ciudadanos obran en registros que nada dejan escapar y que no olvidan. Las intrusiones en la intimidad, antes consumadas de modo singular y aislado, ahora son frecuentemente masivas y anónimas."

[23] *Privacy, a Public Concern: A Resource Document*, op. cit.; Zavala De González, *op. cit.*, págs. 13–14:

"Hasta hace un tiempo relativamente reciente, la intimidad no había sido sentida como un bien frágil y valioso. Ello sólo ha ocurrido cuando la complejidad de la vida actual, de modo especial en las grandes ciudades, el progreso de la ciencia y de la técnica, el desarrollo industrial, la penetración de los medios masivos de comunicación, el vertiginoso aumento de la población mundial, las características de la sociedad de masas (uniformidad de la cultura, proliferación de la propaganda), el acentuado intervencionismo estatal, el creciente avance de la informática, etcétera, han hecho peligrar la intangibilidad espiritual del hombre, y advertir el tremendo riesgo de alienación o dislocación que implicaría la carencia o mutilación de la intimidad, incitando a cimentarla y defenderla."

lores y por ende es a sus disposiciones a las que tenemos que dirigirnos erigiéndolas como los guardianes máximos de estos valores ético-morales, que son consustanciales con la naturaleza humana e indispensables para la convivencia en una sociedad democrática.

En épocas críticas como la que vivimos, de crisis económica, (²⁴) creciente desempleo (²⁵) y alta incidencia criminal (²⁶) que atenta contra la seguridad personal de todos los integrantes de nuestra sociedad, donde los valores sociales parecen estar en proceso de mutación y las instituciones básicas bajo constante asedio, gravita la tentación de anteponer lo que se percibe en un momento dado como un mecanismo rápido y efectivo para obtener un fin legítimo y conjurar uno de los múltiples problemas que acosan y agobian a nuestra sociedad, aunque esto lleve consigo dar al traste con los valores ético-morales más fundamentales del hombre: su dignidad, integridad y derecho a la intimidad.

Tenemos el deber de resistir esta tentación. Debemos sentar las pautas para el uso adecuado de los adelantos científicos y tecnológicos, de forma tal que nos ayuden a confrontarnos con los difíciles problemas de la sociedad moderna, sin que la ansiedad por soluciones fáciles y rápidas nos haga perder de vista la necesidad de proteger y preservar los valores más esenciales para el hombre. (²⁷) "Debe recordarse que la cien-

---

(²⁴) Véase Junta de Planificación de P.R., *Informe Económico al Gobernador*, 1982–83 y 1983–84.

(²⁵) La tasa de desempleo aumentó de un 13.2 por ciento en 1974 a 20.7 por ciento en 1984. Al momento en que ocurrió el despido del recurrente la tasa era de 23.4 por ciento. Departamento del Trabajo y Recursos Humanos, E.L.A., *Empleo y Desempleo en Puerto Rico*, septiembre de 1985, Tabla 1.

(²⁶) Véase Policía de P.R., *Informe sobre Criminalidad en Puerto Rico* (Datos Preliminares al 31 de octubre de 1985).

(²⁷) "No puede olvidarse la neutralidad axiológica de los adelantos técnicos y la posibilidad latente que conllevan de revertir desfavorablemente en contra del mismo hombre que los impulsa: el perfeccionamiento técnico impone un correlativo perfeccionamiento humano." Zavala De González, *op. cit.*, pág. 14.

cia y técnica vive una voluntad de poder no restringida por valoraciones, que puede llevar a un despotismo más o menos fuerte de la vida social que esquematiza y uniforma sin tomar en cuenta lo individual, lo humano." (28)

## V

*Análisis del problema constitucional*

La Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Secs. 1, 7, 8, y 16, en sus partes pertinentes, disponen:

*Sec. 1. [Dignidad e igualdad del ser humano ...]*
La dignidad del ser humano es inviolable. ...

. . . . . . . .

*Sec. 7. [Derecho al disfrute de la propiedad ...]*
Se reconoce como derecho fundamental del ser humano el derecho ... al disfrute de la propiedad. ... Ninguna persona será privada de su ... propiedad sin debido proceso de ley, ...

*Sec. 8. [Protección contra ataques a la honra, a la reputación y a la vida privada]*
Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar.

. . . . . . . .

*Sec. 16. [Derechos de los empleados]*
Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, ... a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, ...

En relación con la Sec. 1, el Informe de la Comisión de la Carta de Derechos rendido a la Convención Constituyente indicó que "[e]l propósito de esta sección es fijar claramente

---

(28) Huber, *El Derecho en el siglo técnico* (disertación), citado por Masnatta, *El derecho a la intimidad ante el impacto de técnica*, 15 Rev. Fed. Argentina C. Abo. (1971).

como base consustancial de todo lo que sigue el principio de la dignidad del ser humano". (29) Sobre la Sec. 8 se dijo que "[s]e trata de la inviolabilidad personal en su forma más completa y amplia [y que e]l honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades. La fórmula propuesta en la sección 8 cubre ambos aspectos. . . La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma". (30)

Con respecto a la declaración constitucional de que "[l]a dignidad del ser humano es inviolable", el delegado Jaime Benítez manifestó :

> *Es la afirmación relativa al principio moral de la democracia; el principio de que el ser humano y su dignidad constituyen la razón de ser y la justificación de la organización política* . . . entendemos que la expresión en su sobria declaración abarca la totalidad de los principios que más adelante van a desenvolverse y a puntualizarse según se requiere en cada caso. (31) (Énfasis suplido.)

El derecho constitucional a la intimidad ha sido objeto de amplia discusión en nuestra jurisprudencia. En *P.R. Tel. Co.* v. *Martínez*, 114 D.P.R. 328 (1983), reconocimos la supremacía de este derecho como uno de los derechos de la personalidad, de índole innata y privada, inherente al hombre. Ya en *García Santiago* v. *Acosta*, 104 D.P.R. 321, 324 (1975), habíamos afirmado que:

> . . . *[l]a intromisión en la vida privada sólo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y a la felicidad del ser humano afectado.* No menos exige la Constitución del Es-

---

(29) 4 Diario de Sesiones de la Convención Constituyente 2561 (1951).
(30) Ibíd., págs. 2566 y 2567.
(31) 2 Diario de Sesiones, *op. cit.*, pág. 1372.

tado Libre Asociado al declarar que la dignidad del ser humano es inviolable, y al condenar el discrimen por motivo de nacimiento, origen o condición social. (Énfasis suplido.)

Este mismo principio fue reafirmado en *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978), donde indicamos que el concepto de la dignidad se ha considerado como una de las piedras angulares del sistema legal.

De otra parte, en *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20, 23 (1974), hicimos hincapié sobre la importancia de la libertad de pensamiento, indicando que sin esa libertad "no puede existir una sociedad libre". Para garantizar y proteger esta libertad sostuvimos el derecho constitucional a la intimidad de la familia aun frente al importante y fundamental derecho, también de jerarquía constitucional, de la libertad de culto. Allí expresamos que "[no concebíamos] derecho de posición preferente a la libertad de estar y sentirse tranquilo en su casa", ya que es allí donde se le brinda a la persona la oportunidad para la serenidad y reflexión, indispensables ingredientes de la libertad de pensamiento.

Al analizar y discutir el derecho a la intimidad y sus raíces constitucionales, en *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 439–440 (1975), indicamos que:

El reconocimiento del derecho a la intimidad en la Constitución de Puerto Rico obedeció básicamente a dos factores. Se estaba respondiendo, en primer término, a un concepto del individuo hondamente arraigado en nuestra cultura. . . .

En segundo término, se quería formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos. De ahí que la Declaración Universal de los Derechos del Hombre y la Declaración Americana de los Derechos y Deberes del Hombre ejerciesen una influencia tan significativa en la redacción de nuestra Carta de Derechos.

En el caso de autos, nos encontramos frente a una interferencia con una de las áreas de intimidad más preciada para

el ser humano: su mente, sus pensamientos. Se le está exigiendo a una persona que para que pueda trabajar como ebanista permita la intrusión de su patrono en sus pensamientos. Esto lo exige el patrono por ser un mecanismo económico y efectivo para proteger su propiedad.

El demandante, un ebanista, en su búsqueda legítima del sustento diario, no debe tener que abdicar su derecho a la intimidad permitiendo que el patrono invada su mente y ausculte sus pensamientos. Ambos derechos —a la intimidad y al trabajo— son consustanciales con la dignidad humana. En este caso, no se han demostrado circunstancias especiales de amenaza real a nuestra seguridad nacional, o un grave peligro para el orden social, o cualquier otro interés apremiante del Estado (32) que justifique la restricción de este importante y fundamental derecho.

Independientemente del grado de confiabilidad que llegue a alcanzar la prueba del polígrafo, su intrusión con la mente del ser humano, con su intimidad, es tal, que éste pierde la libertad de controlar la divulgación de sus propios pensamientos. Esta invasión a la intimidad del hombre sólo puede tolerarse cuando no existan medios menos drásticos para la protección de intereses apremiantes del Estado, y aun así, sólo cuando estén presentes garantías adecuadas, (33) de

---

(32) Aunque el derecho a la intimidad es un derecho fundamental, no es absoluto y circunstancias apremiantes de mayor peso, en ausencia de otras alternativas efectivas, podrían justificar que el Estado específicamente mediante legislación que contenga las salvaguardas necesarias permita su uso. Por ejemplo, agencias de seguridad pública e industrias farmacéuticas que producen sustancias controladas podrían tener la necesidad de proteger intereses sociales más apremiantes que el derecho a la intimidad de los empleados.

(33) Estas garantías pueden incluir la reglamentación y supervisión por el Estado del técnico que suministra la prueba (véase escolio 9); la limitación de las preguntas que se pueden hacer durante la prueba, así evitando que se hagan preguntas que innecesariamente invadan el derecho a la inti-

forma tal que esta invasión se limite a lo que sea estrictamente necesario. Nuestra Constitución garantiza que podamos acotar una parte de nosotros mismos libre de la intromisión tanto del Estado como de los ciudadanos privados.

 Los derechos a la dignidad, integridad personal e intimidad son derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. Una persona respetada en su intimidad y dignidad —que no es otra cosa que el amplio y, en ocasiones, complejo mundo interior individual— sentirá y vivirá la paz, el respeto y la consideración merecida por todo ser humano en una sociedad. Es de esperarse, pues, que esos mismos sentimientos, vitales para una ordenada, racional y pacífica convivencia social, sean proyectados de manera efectiva a nuestro orden social.

 Además, dentro del ámbito de las relaciones obrero-patronales en una sociedad con una tasa de desempleo de un 23.4%, resulta imposible que se produzca una renuncia verdaderamente voluntaria al derecho a la intimidad, cuando esta renuncia se antepone como requisito para obtener o retener un empleo. El riesgo de perder o no obtener el empleo y la posición de desventaja que ocupa el trabajador frente al patrono impiden que se pueda lograr una renuncia realmente voluntaria y libre.($^{34}$) Esto añadido al hecho de que en la

---

midad, los derechos gremiales y cualquier otro derecho garantizado por la Constitución, como por ejemplo, los de libertad de expresión y asociación. Véanse escolios 13 y 14 y texto que los acompaña.

($^{34}$) En relación con el consentimiento del empleado para que se le someta a la prueba del polígrafo, el Tribunal Supremo de Nueva Jersey expresó lo siguiente:

". . . Tampoco hay garantía de que exista una verdadera voluntariedad [al someterse a una prueba de polígrafo], ya que las necesidades económicas son tales que generalmente el empleado no tiene una opción real. Con fre-

prueba del polígrafo la persona se ve impedida de evitar que se registren sus reacciones fisiológicas aunque rehúse contestar, y que por lo tanto, esto imposibilita que pueda saber de antemano los contornos de su renuncia, hace que la persona pierda el control de lo que está dispuesta a revelar, de la intimidad a que está dispuesta a renunciar. Bajo estas circunstancias es imposible que se cumpla con los criterios establecidos en *P.R. Tel. Co.* v. *Martínez*, supra, pág. 343. Allí dijimos que la renuncia al derecho constitucional a la intimidad tiene que ser "patente, específica e inequívoca" y que "[s]alvo esto, el derecho a la intimidad es inviolable", ya fuere por el Estado, una entidad particular o cualquier ciudadano.

 En ausencia de circunstancias especiales que configuren intereses apremiantes del Estado, nuestra sociedad requiere que inclinemos la balanza en favor de la protección de los derechos del obrero a la intimidad, dignidad y a estar protegido contra riesgos para su integridad personal en el trabajo, frente al derecho del patrono al disfrute de su propiedad privada. Para proteger su propiedad, el patrono debe optar por métodos de investigación que sean menos invasores de la intimidad del obrero. Por lo tanto, conforme a todo lo anterior, resolvemos que la Regla 41 del Reglamento de la codemandada Rattan Industries, Inc. es inconstitucional. Los hechos de este caso no justifican que se someta al demandante a la prueba del polígrafo.

---

cuencia, los sindicatos obreros han manifestado una fuerte hostilidad hacia requerimientos patronales de que los empleados se sometan a pruebas de polígrafo, pues las consideran una invasión indebida del profundamente arraigado derecho a la intimidad y a no autoincriminarse involuntariamente." (Traducción nuestra.) *State* v. *Community Distributors, Inc.*, 317 A.2d 697, 699 (N.J. Sup. Ct. 1974), citado con aprobación en *Perks* v. *Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1365–1366 (3er Cir. 1979); *Cordle* v. *General Hugh Mercer Corp.*, 325 S.E.2d 111, 115 (W. Va. 1984).

# VI

*Remedios para la protección de los derechos constitucionales*

■ Repetidamente hemos resuelto que el carácter y primacía del derecho a la intimidad opera *ex proprio vigore* y puede hacerse valer aun entre personas privadas. *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982); *Figueroa Ferrer v. E.L.A.*, supra; *E.L.A. v. Hermandad de Empleados*, supra; *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964); *González v. Ramírez Cuerda*, 88 D.P.R. 125 (1963). A igual conclusión tenemos que llegar en lo que respecta al derecho constitucional que propugna la inviolabilidad de la dignidad del ser humano y aquel que protege a todo trabajador contra riesgo a su integridad personal en el trabajo.

■ También hemos reconocido el derecho a ser indemnizado por los perjuicios que se causen cuando un ciudadano privado interfiere con uno de estos derechos. *Colón v. Romero Barceló*, supra. Esta acción de daños no impide que la persona afectada salvaguarde y proteja su derecho a la intimidad y a la integridad personal en el trabajo mediante el uso del recurso de *injunction*. *P.R. Tel. Co. v. Martínez*, supra; *Sucn. de Victoria v. Iglesia Pentecostal*, supra.

■ Aclarados estos extremos, podemos concluir que el demandante Ariel Arroyo tenía derecho a impedir, mediante el uso del recurso de *injunction*, que se le obligase a someterse a la prueba del polígrafo como condición para retener su empleo de ebanista. Podía, de esta forma, proteger su derecho constitucional a la intimidad y a su integridad personal en el trabajo, al mismo tiempo que preservaba su dignidad como ser humano. También tenía derecho a recobrar cualesquiera daños que se le hubiera ocasionado, como consecuencia de las actuaciones de los demandados tendentes a violar estos derechos constitucionales.

 El hecho de que la violación de los derechos constitucionales en este caso haya ocurrido dentro del contexto de la relación obrero-patronal y que se trate de un obrero contratado sin tiempo determinado (*employment-at-will*), no implica que éste haya renunciado a sus derechos constitucionales y se vea impedido de obtener un remedio real y efectivo que los vindique. A pesar de que, como regla general, a un obrero o trabajador contratado sin tiempo determinado se le puede despedir por justa causa, sin causa o por causa injustificada y que bajo estas circunstancias el único derecho que le asiste es el provisto por la Ley Núm. 80 de 30 de mayo de 1976; no es menos cierto que una excepción a esta norma es que el despido se haga con el propósito y la intención de frustrar o subvertir, o que tenga el efecto de frustrar o subvertir una clara política pública.([35]) En relación con los contratos sin término determinado, la legislación laboral se ha interpuesto para impedir que al separarse al empleado éste quede en total desamparo económico mientras gestiona y consigue nuevo empleo.([36]) *Cassasús* v. *Escambrón Beach Hotel,* 86 D.P.R. 375, 379 (1962). Por lo tanto, esta legislación no puede operar para privar al obrero de los remedios apropiados para vindicar eficazmente sus derechos constitucionales. En el caso

---

([35]) *Odriozola* v. *S. Cosmetic Dist. Corp.,* 116 D.P.R. 485 (1985); Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146–151.

En Estados Unidos se ha reconocido que un empleado puede tener una causa de acción contra el patrono cuando es despedido en una forma que contravenga una política pública importante. *Molush* v. *Orkin Exterminating Co., Inc.,* 547 F. Supp. 54, 55 (E. D. Penn. 1982); *Perks* v. *Firestone Tire & Rubber Co.,* supra; L. K. Larson, *Unjust Dismissal,* Nueva York, Ed. Matthew Bender, 1985, Cap. 1, Sec. 1.01. En *Polsky* v. *Radio Shack,* 666 F.2d 824 (3er Cir. 1981), se sostuvo una acción en daños y perjuicios por un despido de un empleado que rehusó someterse a la prueba del polígrafo a pesar de que éste había firmado un relevo.

([36]) En *Rivera* v. *Security Nat. Life Ins. Co.,* 106 D.P.R. 517, 527 (1977), reconocimos que los remedios de las leyes del trabajo "no excluyen la responsabilidad civil de un patrono por conducta torticera en que incurriere por otros motivos que no sean la mera violación de [estas leyes]".

de autos se trata de una conducta del patrono que le violó los derechos constitucionales fundamentales al empleado. Estamos en presencia de un despido injustificado que subvierte una política pública de rango constitucional. Ante estas circunstancias, el demandante tenía derecho a instar una acción de *injunction* y a reclamar los daños que se le ocasionaron.

Por los fundamentos expuestos y con sujeción a los pronunciamientos vertidos, *se dicta sentencia en la que se revoca la sentencia recurrida y se devuelve el caso al tribunal de instancia para que continúen los procedimientos compatibles con esta opinión.*

El Juez Asociado Señor Rebollo López emitió voto explicativo de conformidad. Los Jueces Asociados Señores Negrón García y Hernández Denton emitieron opiniones concurrentes y disidentes. El Juez Presidente Señor Pons Núñez se inhibió.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

Tres postulados básicos inspiran nuestra decisión. Primero, que en su función normativa y remedial el Derecho atiende y tutela necesidades, problemas y experiencias del ser humano. Éste, como autor y receptor de la ley, le nutre e inyecta en gran medida, a las soluciones que provee, su conocimiento y juicio valorativo ideológico, moral y económico. Segundo, que la norma legal no es enemiga —o no debe serlo— de la verdad científica. Son entera y perfectamente reconciliables. Y tercero, que la realidad científica, al igual que los factores sociales contemporáneos que circundan la vida del Derecho —*Rivera Pitre* v. *Galarza Martínez,* 108 D.P.R. 565, 573 (1979)— no pueden ser descartados por los tribunales en abono de un estado negatorio de la realidad de las cosas o de la personalidad humana. *Moreno Álamo* v. *Moreno Jiménez,* 112 D.P.R. 376, 377–378 (1982).

Bajo esta óptica, coincidimos con la conclusión de que al presente, ante el vacío legislativo existente y la ausencia de

salvaguarda adecuada contra posibles abusos y excesos, un patrono no puede obligar a un empleado a someterse a una prueba del detector de mentiras so pena de despido u otras sanciones disciplinarias. Sin embargo, la opinión del Tribunal, si bien correcta en esa conclusión, no sólo penetra prematuramente, sino que rebasa el ámbito de adjudicación de la controversia y decreta innecesariamente la inconstitucionalidad de un reglamento privado. Por tal razón también disentimos. Así honramos la importante doctrina de abstención sobre pronunciamientos constitucionales cuando los mismos resultan académicos o en abstracto. *Milán Rodríguez* v. *Muñoz*, 110 D.P.R. 610, 618 (1981); *P.I.P.* v. *E.L.A.*, 109 D.P.R. 685 (1980); *Mari Bras* v. *Alcaide*, 100 D.P.R. 506 (1972); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925 (1971); *Pueblo* v. *Marrero*, 79 D.P.R. 649 (1956); *Walker* v. *Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698 (1951); *Spanish Am. Tobacco Co.* v. *Buscaglia*, 71 D.P.R. 991 (1950).

## I

Actualmente existe una legítima polémica respecto a si el detector de mentiras es un instrumento absolutamente confiable para determinar el grado de sinceridad de la persona examinada.[1] E. Mira y López, *Manual de Psicología Jurídica*, 4ta ed., Buenos Aires, Ed. El Ateneo, 1954, págs. 226–234; Nota, *Lie Detectors in Private Employment: A Proposal for Balancing Interests*, 33 Geo. Wash. L. Rev. 932, 934 (1965); S. Gardner, *Wiretapping the Mind: A Call to Regulate Truth Verification in Employment*, 21 San Diego L. Rev. 295, 296, 302 (1984); J. Skolnick, *Scientific Theory and Sci-*

---

[1] Una de las mayores críticas que se le ha hecho al detector es que el técnico hace una evaluación subjetiva. S. Gardner, *Wiretapping the Mind: A Call to Regulate Truth Verification in Employment*, 21 San Diego L. Rev. 295, 305 (1984). En Puerto Rico el problema es más agudo. No existe reglamentación alguna en cuanto a un aspecto tan elemental, pero sensible, sobre quién está capacitado para ser técnico.

*entific Evidence: An Analysis of Lie-Detection*, 70 Yale L.J. 694, 695 (1961). La pugna de su confiabilidad —como realidad no superada aún por la ciencia— ha motivado que su uso sea muy limitado en ciertas áreas sensitivas.

Desde hace unas décadas la prueba del detector comenzó a utilizarse en el campo laboral. A juicio del sector patronal, constituía un instrumento rápido y económico para determinar si la información suministrada por solicitantes o sus empleados era veraz. Gardner, *op. cit.*, pág. 296. También se extendió en las investigaciones de delitos cometidos por empleados dentro de los negocios. S. Penrod, E. Loftus y J. Wrinkler, *The Reliability of Eyewitness Testimony: A Psychological Perspective*, compilado en *The Psychology of the Courtroom* (Kerr y Bray, editores), Nueva York, Ed. Academic Press, 1982, Cap. 5, págs. 119, 144–146.

Tiempo después, estas prácticas comenzaron a ser severamente criticadas. D. Nagle, *The Polygraph in the Workplace*, 18 U. Rich. L. Rev. 43, 56 (1983); Gardner, *op. cit.*, pág. 297; Skolnick, *op. cit.*, pág. 694 n. 2. Ello provocó legislación estatal que prohibía, limitaba considerablemente y reglamentaba la profesión del técnico de prueba. No obstante, nadie discute seriamente la utilidad en el sector público y privado de un sinnúmero de otras pruebas para determinar la aptitud de un solicitante o evaluar la idoneidad de quien desempeña un cargo. *Cf.* M. Miner y J. Miner, *Employee Selection Within the Law*, 2da ed. rev., Washington, Ed. BNA, 1979. Una de ellas es la prueba psicológica. Mediante la misma se pretende obtener un perfil de la personalidad, a los fines de predecir o establecer aptitudes, dotes, actitudes y reacciones relacionadas con diferentes funciones. En lo esencial, nos llama la atención la gran similitud entre esta prueba y la del detector de mentiras. Ambas carecen de absoluta confiabilidad científica. Sin embargo, sirven de base para apoyar decisiones patronales cruciales respecto al empleo. El negarse a contestar preguntas sujeto a un detector, al igual que ante un psicólogo, es

un comportamiento que es *interpretado*. Cualquiera que sea el significado atribuible, ciertamente sirve para la formulación del resultado al final de la prueba.

Ahora bien, en contraste con las pruebas psicológicas, el detector ha recibido una acogida negativa. La explicación parece estar en la forma en que se administra la prueba, el tipo y sus resultados. Las pruebas psicológicas arrojan un perfil de la personalidad, algo que de ordinario nadie pretende o puede totalmente ocultar. El detector implica adherir físicamente unos aditamentos para registrar ciertos cambios fisiológicos. Como máquina inanimada, intenta examinar la veracidad o mendacidad de la persona en cuanto a un hecho específico. Aunque puede ser mortificante que un psicólogo u otro profesional se equivoque al apreciar algunos rasgos de nuestra personalidad, ello no es tan hiriente como ser tachado de mentiroso por una conclusión derivada de una máquina y su intérprete. La distinción no sólo es fundamental, sino eminentemente humana. Esta fragilidad humana es determinante.

En Puerto Rico no existe estatuto que autorice o prohíba el uso total o limitado del detector en el campo laboral de la industria privada. Así, en buena metodología adjudicativa, al evaluar su legalidad nos vemos compelidos a: (1) disentir de la conclusión y enfoque judicial de que la máquina, per se, viola el derecho a la intimidad. Esa premisa es errónea. Son las preguntas las que son susceptibles de invadir esferas personales protegidas constitucionalmente; (2) enfatizar que el asunto es en extremo complejo y su prohibición absoluta fundada en un análisis abstracto y a destiempo del derecho a la intimidad, tiene como consecuencia directa o indirecta eliminar e impedir la utilización de otras pruebas que también tocan áreas sensibles y se realizan en el sector industrial, y (3) posponer, con arreglo a la norma de abstención constitucional antes enunciada, cualesquiera otros pronunciamientos en esa dimensión. La cuestión no está madura.

## II

Aclarado este extremo, examinemos la juridicidad del uso del detector de mentiras en el caso de autos. Aquí el patrono Rattan Specialties, Inc., mucho tiempo después de haber empleado al demandante Arroyo, estableció dicha prueba sobre una base de regularidad. Esta práctica rutinaria la elevó a la norma disciplinaria en el Reglamento, bajo apercibimiento de sanciones desde una semana de suspensión hasta la separación permanente. Al hacerlo así, condicionó la seguridad de retención de empleo a dicho examen. (²)

Decidir la estabilidad económica y bienestar de un obrero y su familia, que en última instancia es la más afectada, por la aplicación mecánica de una regla de conducta que a su vez se apuntala en dos factores altamente contingentes —un detector cuya confiabilidad se discute y un técnico cuya destreza y capacidad desconocemos— es contrario a la política pública prevaleciente en nuestra jurisdicción de promover y proteger la seguridad de empleo. El uso indiscriminado, de manera irrestricta y no cualificado, so pena de despido, lesiona valores apremiantes en el ámbito laboral. También atenta contra un interés comunitario: la paz industrial. Su uso absoluto puede ser germen de múltiples controversias obrero-patronales y de intranquilidad laboral. Hasta tanto tengamos ante nos un esquema legislativo al respecto, no debemos judicialmente refrendar su uso.

Por otro lado, los últimos años se han caracterizado por unos adelantos insospechados en las áreas de las computadoras y otros instrumentos, aplicados en la medicina, para diagnosticar, medir y registrar cambios y reacciones en los distin-

---

(²) En *Wolf* v. *Neckwear Corporation*, 80 D.P.R. 537 (1958), resolvimos que la desconfianza del patrono en un empleado, no es justa causa para su despido.

tos sistemas del cuerpo humano. Por tal razón no hemos de descartar la posibilidad de que la ciencia pueda evolucionar y lograr que el detector se convierta en un instrumento confiable para medir la sinceridad de las personas. En esta situación, insistimos, no sería la máquina como tal, sino las preguntas, lo que podría atentar contra el derecho a la intimidad.

Los tribunales no debemos darle la espalda a los adelantos científicos que promuevan una mayor certeza fáctica. Las pruebas serológicas, como evidencia de exclusión de paternidad, es un ejemplo donde el desarrollo científico ha permitido a los tribunales penetrar en dimensiones hasta hace poco remotas. *Ortiz* v. *Peña*, 108 D.P.R. 458 (1979); *Moreno Álamo* v. *Moreno Jiménez*, supra.

Recapitulando, concurrimos en la decisión y resolvemos que no procedía desestimar la demanda, ya que los hechos alegados configuran un despido injustificado. El uso rutinario del detector de mentiras, sin que se haya comprobado su confiabilidad y justificado su necesidad es contrario a la política laboral existente. Disentimos en los pronunciamientos a nivel constitucional. Los mismos constituyen una adjudicación a destiempo que innecesariamente trasciende la verdadera razón de decidir.

—O—

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.

Concurro en el resultado de la opinión mayoritaria por entender que obligar a un trabajador a someterse periódicamente a una investigación mediante el detector de mentiras sin ninguna justificación legítima atenta contra su dignidad e integridad en el empleo, en violación de la Constitución del Estado Libre Asociado. Difiero, sin embargo, del análisis so-

bre el derecho a la intimidad de la opinión mayoritaria. Ésta desprovee de contornos manejables el derecho a la intimidad. Su *ratio decidendi* se proyecta mucho más allá de la controversia ante nos. Afecta actividades que de otra forma serían lícitas, proscribiéndolas. Además, como el uso del detector de mentiras en las relaciones obrero-patronales es precisamente un asunto que está pendiente de consideración legislativa, entiendo que por el momento la prudencia y la cautela judicial, así como el respeto y la deferencia hacia la Rama Legislativa aconsejan una intervención cuidadosa y limitada en este asunto.

## I

Nos corresponde el deber ineludible de darle fuerza y vitalidad a los principios generales sobre cuestiones fundamentales de la vida colectiva de nuestro pueblo, que están enmarcadas en la Constitución. Al interpretar sus postulados básicos nunca debemos olvidar que "una *Constitución* no establece, ni debe establecer, normas para la hora que pasa, sino principios para un futuro que se expande". B. Cardozo, *La naturaleza de la función judicial* (E. Ponssa, traductor), Buenos Aires, Eds. Arayú, 1955, pág. 64. Hay que evitar pronunciamientos que la fosilicen y la conviertan en una pieza de museo de historia: "Su vitalidad descansa en su *dinamismo*. Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. . . . Interpretamos una Constitución, no los Rollos del Mar Muerto." *P. R. Tel. Co.* v. *Martínez*, 114 D.P.R. 328, 350 (1983). Si limitamos su alcance con normas y pronunciamientos taxativos, convertimos su texto en dogmas absolutos e inaplicables frente a las eventualidades del futuro:

> Como en todo intento de formular normas básicas, la especificación exagerada de los detalles es una garantía iluso-

ria de efectividad, que sólo sirve para dramatizar la impotencia de la regla frente a la complejidad y variabilidad de las situaciones humanas. Los preceptos constitucionales de alto rango tienen que ser principios que consientan un margen discrecional para reglamentar ante circunstancias imprevistas y hasta imprevisibles de acuerdo con los ideales de conducta establecidos en ellos. Escuela de Administración Pública, U.P.R., *La nueva constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 123.

Finalmente, debemos tener claro que a diferencia de la Constitución de Estados Unidos, nuestra Constitución contiene disposiciones que requieren del Estado no sólo que se abstenga de infringir los derechos de los ciudadanos, *status negativus libertatis*, pero también le exige a éste acción positiva en beneficio del individuo, *status creditoris*. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 200.[1] Tanto la Sec. 8[2]

---

[1] Al enfrentarnos a la catalogación y precisión de los derechos humanos en las constituciones modernas, siguiendo una de las definiciones más difundidas, podemos subsumirlos en las siguientes:

. . . "el *status negativus libertatis* o derechos límite, mediante los cuales se reserva al individuo o a aquellas proyecciones más inmediatas del mismo (v.gr., la familia) una esfera de libertad a la que, en principio, no puede afectar la acción del poder; el *status positivus libertatis*, en virtud del cual el individuo manifiesta al exterior, de ahí el concepto de 'derechos oposición', esa misma esfera de intimidad (v.gr., las libertades de expresión, reunión, asociación, etc.); el *status activae civitatis* o derechos de participación en el ejercicio del poder (v.gr., el derecho de sufragio); el *status creditoris*, cuyo contenido no está constituido por derechos 'destinados a garantizar la libertad frente al Estado y la protección contra el Estado', sino que, . . . 'son pretensiones del individuo o del grupo colectivo ante el Estado'." M. Herrero De Miñón, *Nacionalismo y constitucionalismo; el Derecho constitucional de los nuevos estados*, Madrid, Ed. Tecnos, 1971, págs. 396–397. Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 199 y ss. *Cf.* J. A. González Casanova, *Teoría del estado y derecho constitucional*, 2da ed. rev., Barcelona, Ed. Vicens-Vives, 1983, pág. 246.

[2] "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar."

como las Secs. 16(³), 17(⁴) y 18(⁵) de nuestra Carta de Derechos requieren esta función dual del Estado: que se abstenga de violarle a los ciudadanos los derechos allí garantizados y que actúe "positiva[mente] . . . en beneficio del individuo". Trías Monge, *op. cit.*, pág. 200.

## II

Uno de los valores más importantes reconocidos por nuestra Constitución es el derecho de toda persona a la "protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II, Sec. 8.(⁶) Su texto tiene origen en el Art. V de la Declaración Americana de los Derechos y Deberes del Hombre. Trías Monge, *op. cit.*, pág. 189.(⁷)

---

(3) "Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra *riesgos para su salud o integridad personal* en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley." (Énfasis suplido.)

(4) "Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar."

(5) "A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales."

(6) Por esta razón no puede decirse que el derecho de intimidad, en Puerto Rico, sea fruto de un avivamiento de la era de *Lochner* v. *New York*, 198 U.S. 45 (1905). Véase J. Nowak, R. Rotunda y N. Young, *Constitutional Law*, 2da ed., Minnesota, Ed. West. Pub. Co., 1983, pág. 737.

(7) Esta Declaración, junto con la Declaración Universal de los Derechos del Hombre y la Declaración de los Derechos Esenciales del Hombre sirvieron de modelo e inspiración al forjarse nuestra Carta de Derechos. Véanse: *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975);

En Puerto Rico el carácter del derecho y protección de la vida privada tiene un historial distinto y más amplio que el reconocido bajo la Constitución federal. *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 439–440 (1975). En Estados Unidos, el derecho a la intimidad es hijo de la jurisprudencia. *Griswold* v. *Connecticut*, 381 U.S. 479 (1965); *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972); *Roe* v. *Wade*, 410 U.S. 113 (1973); *Carey* v. *Population Services International*, 431 U.S. 678 (1977). Su alcance no es muy preciso. L. H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1978, pág. 886 y ss. Pero en general puede afirmarse que protege dos intereses fundamentales: "Uno es el interés individual de evitar la divulgación de asuntos personales y el otro es el interés de poder tomar decisiones importantes independientemente." (Traducción nuestra.) *Whalen* v. *Roe*, 429 U.S. 589, 599–600 (1977).

En nuestra jurisdicción hemos reconocido que el derecho a la vida privada y familiar opera *ex proprio vigore*, y puede hacerse valer entre personas privadas al eximirlas del requisito de acción estatal: "[e]ste derecho constitucional impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos". *Colón* v. *Romero Barceló*, 112 D.P.R. 573, 576 (1982); *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A.* v. *Hermandad de Empleados*, supra.([8]) Por eso tiene el carácter dual de derecho y de protección tanto frente al Estado como ante otras personas.

Trías Monge, *op. cit.*, pág. 201; *La nueva constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 217.

([8]) Aunque ya este Tribunal anteriormente resolvió que la Sec. 8 de la Carta de Derechos aplica entre particulares, *Colón* v. *Romero Barceló*, 112 D.P.R. 573 (1982); *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A.* v. *Hermandad de Empleados*, supra, quisiéramos aquí destacar el informe de la Comisión de la Carta de Derechos que reafirma esta posición:

"El honor y la intimidad son valores del individuo que merecen protección cabal, *no sólo frente a atentados provenientes de otros particulares*, sino también contra ingerencias abusivas de las autoridades." (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2566 (1952).

Por su primacía también hemos reconocido que se puede hacer valer mediante el recurso de *injunction*, *E.L.A.* v. *Hermandad de Empleados*, supra, y la acción de daños y perjuicios bajo el Art. 1802 del Código Civil. *Colón* v. *Romero Barceló*, supra.

Debemos, en primer lugar, resolver si en el presente caso nos encontramos frente a una violación de este derecho. El peticionario nos solicita que emitamos un *injunction* para impedir que el demandado lo someta a una prueba del detector de mentiras, como condición para permanecer en el empleo. Sin embargo, en la presente controversia no se está limitando la facultad del peticionario para tomar decisiones personales, familiares o íntimas, como la terminación de un embarazo, *Roe* v. *Wade*, supra; *Pueblo* v. *Duarte Mendoza*, 109 D.P.R. 596 (1980); la de divorciarse sin tener que exponer públicamente la vida íntima, *Figueroa Ferrer* v. *E.L.A.*, supra; la de utilizar anticonceptivos, *Griswold* v. *Connecticut*, supra; *Eisenstadt* v. *Baird*, supra; *Carey* v. *Population Services International*, supra.

Tampoco estamos frente a un caso donde los tribunales son llamados a intervenir para proteger o salvaguardar la tranquilidad del hogar, *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20 (1974); *E.L.A.* v. *Hermandad de Empleados*, supra, o para proteger a un ciudadano de recibir un "raudal de llamadas indeseables y ofensivas", *P.R. Tel. Co.* v. *Martínez*, supra, pág. 335, o de sufrir continuamente la exhibición por los medios de comunicación de fotos que constituyen una indebida intromisión en la vida familiar, *Colón* v. *Romero Barceló*, supra.

Del análisis anterior concluimos que la razón de ser de este derecho continúa siendo la protección al ciudadano "contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar" por parte del Gobierno o de ciudadanos privados. Estos ataques se han manifestado a través de la diseminación innecesaria o indiscriminada de información, la

divulgación de información falsa o calumniosa, la limitación al ciudadano en la facultad de tomar decisiones relacionadas con su vida íntima y familiar, la obtención de información íntima y familiar o la violación a la tranquilidad del hogar y la vida familiar. (⁹) Lo que constituye un "ataque abusivo" dependerá de las circunstancias específicas en que se manifiesta la acción estadual o personal y la naturaleza del interés privado o familiar que se quiere proteger.

En el caso de autos la posible violación del derecho a la intimidad emanaría de una intromisión indebida en la vida íntima del peticionario o de una diseminación innecesaria de información obtenida sobre su persona. No nos persuade el razonamiento de la opinión mayoritaria de que someterse al detector de mentiras por sí solo viola el derecho a la intimidad. No es la máquina la que viola el derecho a la intimidad. Quien podría violarla es la persona que administra la prueba y aquellos que ordenaron que se administrara.

No entiendo en qué viola el derecho a la intimidad una prueba del detector de mentiras, cuando *sólo* se pregunte aquello que normalmente se pregunta en cualquier entrevista de empleo. Ese ha sido el análisis seguido por la escasa jurisprudencia federal que se ha enfrentado a este problema. En *Thorne* v. *City of El Segundo*, 726 F.2d 459 (9no Cir. 1983), citado en el escolio 7 de la opinión mayoritaria, no se resuelve que el uso del detector de mentiras en el área gubernamental viola la ley de derechos civiles federales, 42 U.S.C. sec. 1983. Allí lo que se resolvió fue que el haberle preguntado a la peti-

---

(⁹) No pretendemos agotar todos los campos de acción en los cuales potencialmente el derecho a la intimidad pueda actuar, ni tampoco elaborar una definición de éste. Tenemos muy presente la advertencia hecha por uno de los mayores defensores del derecho a la intimidad, el profesor Tribe: "A concept in danger of embracing everything is a concept in danger of conveying nothing." L. H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1978, págs. 888–889.

cionaria sobre su conducta sexual y el basar la decisión de no emplearla en las respuestas a esas preguntas violó sus derechos civiles. Íd., pág. 471. El resultado sería el mismo aun si el interrogatorio no se hubiese realizado mediante un detector de mentiras. En *Hester* v. *City of Milledgeville*, 777 F.2d 1492, 1497 (11mo Cir. 1985), se siguió un análisis similar; escudriñar el tipo de preguntas y el uso que se les iba a dar a las contestaciones.

No tenemos dudas de que en ciertas circunstancias el uso del detector de mentiras puede infringir el derecho a la intimidad, particularmente en el contexto de las relaciones entre el patrono y el obrero. Véase L. M. Fariñas Matoni, *El Derecho a la Intimidad*, Madrid, Ed. Trivium, 1983, págs. 51–52. Pero el mero hecho de que una actuación pueda violentar los derechos constitucionales no hace de por sí su ejercicio ilegal ni nos da la facultad de proscribirla. La celebración del tipo de actos religiosos en *Sucn. de Victoria* v. *Iglesia Pentecostal*, supra, violaba los derechos constitucionales de los vecinos, pero eso de por sí no impedía la permanencia de la iglesia en el vecindario. Situación similar se presentó en el caso de *E.L.A.* v. *Hermandad de Empleados*, supra, y el de *Colón* v. *Romero Barceló*, supra. El hecho de que las actuaciones allí impugnadas violaran el derecho a la intimidad de terceros no convirtió ese tipo de actuación en ilegal. Por supuesto, si alguien, y en especial un obrero, honestamente cree que al sometérsele a un detector de mentiras pueden violársele sus derechos constitucionales, los tribunales son el vehículo apropiado para asegurar que la administración de la prueba no viole sus derechos.

En conclusión, no es de aplicación el derecho a la intimidad en esta controversia *según está planteada ante nos.* El derecho a la intimidad protege contra la indebida o culposa intromisión de terceros en la esfera de atributos de la perso-

nalidad([10]) de alto rango social. La *intromisión* no se realizó en este caso. No tenemos información sobre el cuestionario utilizado ni las circunstancias en que se aplicaba la prueba. Tampoco sabemos qué problemas empresariales motivaron el uso del detector de mentiras. No sabemos quién suministraba la prueba ni con qué tipo de equipo. En fin, los autos no contienen la información que tradicionalmente utilizamos para hacer el balance de interés en estas controversias. *Colón* v. *Romero Barceló*, supra, págs. 580–582. El planteamiento constitucional en este contexto es prematuro. Desde el punto de vista de la procedencia de un *injunction* no puede decirse que probablemente se lesione el derecho del peticionario. Éste no ha aportado prueba en este respecto.

### III

Si bien entendemos que al peticionario no se le ha violado su derecho a la intimidad, esto no significa que esté huérfano de protección jurídica. Cabe preguntarnos si la actuación del patrono, en las peculiares circunstancias de este caso, está proscrita por la Sec. 16 de nuestra Carta de Derechos.

La controversia a la cual nos enfrentamos requiere una interpretación armónica de nuestra Carta de Derechos, en especial de las Secs. 1([11]) y 16. Para esto es menester estudiar las discusiones de los delegados en la Convención Constituyente de 1952, así como las corrientes de interpretación constitucional moderna.

---

([10]) Dentro del concepto de personalidad incluimos la familia, por imperativo constitucional. Art. II, Sec. 8, Constitución del E.L.A.: "vida privada o *familiar*". (Énfasis suplido.)

([11]) "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana." Art. II, Sec. 1, Constitución del Estado Libre Asociado de P.R.

Luego de darse lectura en la Convención Constituyente a la Carta de Derechos propuesta por la Comisión de la Carta de Derechos, el delegado señor don Jaime Benítez, Presidente de dicha Comisión, expresó lo siguiente:

> Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición [la Carta de Derechos]. Tal vez toda ella está resumida en la primera oración de su primer postulado: *la dignidad del ser humano es inviolable.* Esta es la piedra angular y básica de la democracia. En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene *todo el orden constitucional de descansar en ella, protegerla y defenderla.* (Énfasis suplido.) 2 Diario de Sesiones, *op. cit.,* pág. 1103.

Lenguaje similar contiene el Informe de la Comisión de la Carta de Derechos al discutir el alcance de la Sec. 1. Ibíd., T. IV, pág. 2561.

Con este principio fundamental como norte es que debemos analizar el alcance de nuestra Carta de Derechos. Como muy bien se ha dicho, "la Sección 1 de la Carta de Derechos de Puerto Rico reviste, por su estilo y contenido, una característica de fundamental importancia hasta tal punto que si la Carta no contuviera más nada sobre el particular, el resto de su texto aún así parecería ser un derivado lógico y consecuente del principio de la inviolabilidad de la dignidad del hombre". J. J. Santa-Pinter, *Los derechos civiles en Puerto Rico*, Río Piedras, Ed. Edil, 1973, pág. 21.

Al interpretar el alcance de la Sec. 16 en torno al derecho de todo trabajador a tener protección contra riesgos a su salud o integridad personal, no podemos sino concluir que dentro de esta cláusula están subsumidos los principios básicos sobre la dignidad del ser humano. El concepto "integridad personal" tiene que ser analizado dentro de todo el contexto de

la Carta de Derechos. Más aún, por imperativo constitucional de la Sec. 19, su lectura tiene que ser liberal. ([12])

La Sec. 16 de nuestra Constitución al igual que la Sec. 8 también aplica entre particulares. No tiene ningún valor jurídico que nuestra Constitución reconozca unos derechos a los obreros si los tribunales no están en disposición de vindicarlos. De hecho, la mayoría de las disposiciones de las Secs. 16, 17 y 18 frente a quien tienen vigencia es frente a particulares. ¿De que valdría el derecho a una jornada de ocho horas si esto no se pudiese poner en vigor frente a un patrono privado? ¿El derecho a la negociación colectiva? ¿A la huelga? No podemos permitir que los derechos consagrados en nuestra Constitución sean meras aspiraciones abstractas. Al interpretarlas, debemos hacer un reconocimiento explícito del valor jurídico de sus declaraciones de derechos y libertades. Véanse: *Amy* v. *Adm. Deporte Hípico*, 116 D.P.R. 414 (1985); J. A. González Casanova, *Teoría del estado y derecho constitucional*, 2da ed. rev., Barcelona, Ed. Vicens-Vives, 1983, pág. 247.

---

([12]) La Sec. 19 de la Carta de Derechos dispone en parte: "La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente."

La propia Comisión de Carta de Derechos adelanta en su informe la regla de interpretación constitucional que la Sec. 19 impone:

"Esta sección establece dos reglas paralelas de interpretación. La primera va enderezada a proteger los derechos del individuo contra una interpretación restrictiva o contra una interpretación basada en la conocida norma de *inclusio unius, exclusio alterius*. Según este último principio interpretativo, el acto de enumerar conlleva el acto de excluir, de suerte que todo lo que no se menciona queda por ese solo hecho descartado. No creemos que en una constitución deba incorporarse un principio de esta inflexibilidad. . . . *Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión* al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables." 4 Diario de Sesiones, *op. cit.*, pág. 2576.

Véanse también Trías Monge, *op. cit.*, págs. 207–209; *La nueva constitución de Puerto Rico, op. cit.*, pág. 123.

Precisamente porque hay que dar un reconocimiento explícito del valor jurídico protegido por la Sec. 16 es que el mecanismo procesal del interdicto (*injunction*) es el más adecuado para vindicar estos derechos. Esta es la única forma de evitar una transgresión a la "integridad personal" del obrero. Mecanismo similar reconoce la Ley Núm. 100 de 30 de junio de 1959 en su Art. 1 (29 L.P.R.A. sec. 146), cuando dispone que en casos de despido por razón de edad avanzada, raza, color, religión, origen o condición social, el tribunal podrá "ordenar al patrono que reponga en su empleo al trabajador y que *cese y desista* del acto de que se trate". (Énfasis suplido.) Ese mandato legislativo de la Ley Núm. 100 no es sino la expresión legislativa de un mandato superior, el mandato constitucional. Al poner en vigor la Sec. 16, estamos judicialmente reconociendo el mandato constitucional de que la integridad moral, física, y espiritual del obrero no se viole so pretexto de proteger los intereses propietarios del patrono. ([13])

## IV

Debemos, pues, resolver si al imponerle al peticionario en este caso como condición para permanecer en el empleo que se someta a la prueba del detector de mentiras viola su "integridad personal en su trabajo". Al hacer este análisis, debemos tener claro que lo que potencialmente viola la integridad del obrero son las circunstancias en las que se administra la prueba y no la prueba o la máquina en sí. ([14])

---

([13]) La Declaración Universal de Derechos del Hombre, que, como anteriormente dijimos, sirvió en gran medida de fundamento ideológico a nuestra Carta de Derechos, en su Art. 8 dispone:

"Toda persona tiene derecho a un recurso efectivo, ante los tribunales nacionales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la constitución o por la ley."

([14]) Un análisis de la prueba en sí nos enfrentaría al problema de intimidad, que por las razones anteriormente esbozadas hemos descartado en este caso.

Principios rectores de interpretación judicial del alcance de los derechos constitucionales nos obligan a establecer unos criterios de análisis para este tipo de controversia, que no conlleven una prohibición absoluta sobre el uso por parte de las empresas privadas de este tipo de equipo investigativo.

En primer lugar, debemos evaluar el interés y las necesidades apremiantes del que pretende usar el equipo para hacer una investigación de sus empleados. También se debe examinar el tipo de equipo que será utilizado, su confiabilidad, y el modo en que opera. En tercer lugar, hay que estudiar las circunstancias especiales en que se va a utilizar y quién administrará la prueba. Las preguntas del cuestionario deben ser pertinentes y relevantes a los objetivos trazados por el patrono. No pueden intervenir con el ámbito de la intimidad del trabajador. La prueba debe ser previamente validada científicamente. El criterio normativo debe ser su razonabilidad en las circunstancias específicas. La frecuencia con que se aplican las pruebas y el uso que se les dará también son relevantes. Finalmente, quién tendrá acceso a la información y qué oportunidad real tendrá el afectado para exponer su posición sobre la validez del resultado, tienen que ser celosamente considerados. Estos son los criterios mínimos que hay que considerar al evaluar la constitucionalidad del uso del detector de mentiras por la empresa privada.

La Asamblea Legislativa puede formular otras salvaguardas razonables para garantizar la protección de este derecho constitucional. Es un asunto que requiere legislación y atención urgente por esta otra rama del Gobierno.

En el caso de autos, al obrero se le exigió que se sometiere a la prueba del detector de mentiras sin ninguna justificación aparente. La prueba no se iba a realizar como parte de una investigación en curso. No estamos frente a un caso de una industria inherentemente peligrosa o de la industria farmacéutica, o ante una actividad de importancia para la seguridad

pública. El patrono pretende justificar su requerimiento al amparo de un interés generalizado de proteger su propiedad. No ha adelantado ninguna necesidad válida para la prueba. Tampoco se ha acreditado válidamente el peritaje del examinador y el uso que a los resultados de la prueba se le va a dar. Finalmente, entiendo que la incertidumbre a la que es sometido un obrero que sabe que en cualquier momento puede ser compelido, arbitraria y caprichosamente, a que se le administre una prueba del detector de mentiras constituye un mecanismo de coerción y hostigamiento en el empleo, que atenta contra la integridad y la dignidad del trabajador proscrita por nuestra Carta de Derechos.

En resumen, cuando a un obrero le es requerido que se someta a una prueba de detector de mentiras, el patrono tiene que esbozar razones concretas y válidas por las cuales interesa someterlo a dicho examen. El obrero tiene el derecho a desempeñarse en su trabajo sin la amenaza constante de que podrá ser sometido a dichas pruebas. Una vez el patrono acredite válidamente su justificación para efectuar el examen, tendrá que incluir todas las salvaguardas necesarias para garantizar que el examen no infrinja el derecho a la intimidad del examinado. *Quaere* si un despido basado únicamente en los resultados de una prueba del detector de mentiras válidamente tomada constituye justa causa bajo la Ley Núm. 80. Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a–185*l*).

Por las razones expuestas anteriormente, concurro en el resultado a los efectos de que no se debió desestimar la acción del recurrente, pero disiento del análisis sobre la intimidad. Los hechos alegados en la demanda de su faz aducen una causa de acción que debe dilucidarse en el tribunal de instancia. Devolvería el caso al tribunal a quo para que resuelva la controversia a base de los criterios aquí expresados.

—O—

Voto explicativo de conformidad emitido por el Juez Asociado Señor Rebollo López.

Hemos dado nuestra conformidad a la opinión mayoritaria del Tribunal, suscrita por la compañera Juez Asociada Señora Naveira de Rodón, por dos razones. En primer lugar, por entender que resulta *ineludible* el análisis desde el punto de vista constitucional que se hace en la referida ponencia relativo a la norma reglamentaria de la parte recurrida que requiere de sus empleados el someterse a exámenes periódicos del polígrafo como condición para retener su empleo. En segundo lugar, por ser del criterio que es jurídicamente correcta la determinación o declaración de inconstitucionalidad que de la referida norma reglamentaria se hace; ello, por razón de que la misma no sólo atenta contra el "derecho a la intimidad" garantizado por la Sec. 8 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, sino porque, en adición, constituye un atentado contra la "integridad personal" del recurrente, la cual le es garantizada a todo obrero por la Sec. 16 del citado Art. II de nuestra Constitución.

## I

Como sabemos, en el ámbito del Derecho privado, son "inválidos" aquellos actos que son contrarios a la ley, a la moral, al orden público, o a la Constitución en aquello en que la misma aplique a partes privadas.

No existe ley alguna aprobada por nuestra Asamblea Legislativa que prohíba el uso del polígrafo en esta clase de situaciones. Dicha práctica no es contraria a ninguna norma de índole moral o de "orden público" (1) que no sean aquellas que precisamente emanan de la Constitución misma.

---

(1) En cuanto al término "orden público", debemos recordar que este Tribunal en sus diversas interpretaciones del referido término, consistentemente ha buscado su expresión *en la ley. Cf. Asoc. de Condóminos* v. *Segu-*

Por otro lado, tampoco existe una clara expresión legislativa que le sirva de apoyo a una "política pública" que impida la práctica en controversia. Somos del criterio que bajo un patrón de correcta metodología adjudicatoria, la discusión no puede limitarse a una mera enunciación sobre la promoción de la "paz industrial" con total abstracción de los valores constitucionales envueltos. En resumen, a diferencia del compañero Juez Asociado Señor Negrón García, entendemos que, encontrándonos ante un total "vacío legislativo", el análisis constitucional que se realiza en la opinión mayoritaria resulta obligatorio e inescapable.

## II

El análisis de "escrutinio estricto" surgió inicialmente para examinar la validez de legislación que discriminaba entre clases o tipos de personas mediante lo que se caracterizó como "clasificaciones sospechosas". *Korematsu* v. *United States*, 323 U.S. 214 (1944); *McLaughlin* v. *Florida*, 379 U.S. 184 (1964); *Loving* v. *Virginia*, 388 U.S. 1 (1967); en Puerto Rico véase *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975). En otras palabras, este tipo de análisis nació para garantizarle a ciertos grupos raciales y étnicos tradicionalmente oprimidos, la igual protección de las leyes. Con el pasar del tiempo el análisis se extendió a situaciones donde se examinaba legislación que aunque no envolvía clasificaciones que per se eran sospechosas, las mismas coartaban los "derechos fundamentales" de ciertos grupos. *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663 (1966) (derecho al voto); *Griffin* v. *Illinois*, 351 U.S. 12 (1956) y *Douglas* v. *California*, 372 U.S. 353 (1963) (acceso a las cortes); *Shapiro* v. *Thompson*, 394 U.S. 618 (1969) (derecho a viajar).

---

*ros Arana*, 106 D.P.R. 133 (1977); *Asoc. de Condóminos* v. *Centro I, Inc.*, 106 D.P.R. 185 (1977), y *Hernández* v. *Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149 (1976).

Eventualmente, el análisis de escrutinio estricto se utilizó en protección de derechos individuales fundamentales aun en situaciones donde propiamente no estaba presente un problema de discriminación o clasificación legislativa. Ello se ha hecho mediante un examen bajo el debido proceso sustantivo. Véanse: *Roe* v. *Wade*, 410 U.S. 113 (1973); *Sherbert* v. *Verner*, 374 U.S. 398 (1963); en Puerto Rico véase *Pueblo* v. *Duarte Mendoza*, 109 D.P.R. 596 (1980). (²)

Deberá observarse que por ser los derechos constitucionales, como regla general, oponibles sólo frente al estado, en los casos anteriormente mencionados se cuestionaba la validez de legislación federal, estatal o municipal. En Puerto Rico, sin embargo, en atención a que el "derecho a la intimidad" tiene un historial distinto y más amplio que el plasmado en la jurisdicción federal, hemos resuelto que el mismo opera *ex proprio vigore* y puede hacerse valer entre personas privadas, eximiéndose del requisito de "acción estatal" (*state action*). *Colón* v. *Romero Barceló*, 112 D.P.R. 573, 576 (1982). (³)

Aunque no carece de toda legitimidad el reclamo de la recurrida de que a este derecho de privacidad se opone su derecho a proteger su propiedad, *debemos concluir que en este caso la Constitución expresamente resuelve este conflicto de derechos al establecer en la Sec. 16 del Art. II que:*

> Se reconoce el derecho de todo *trabajador* a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, *a protección contra riesgos para su salud o integridad personal en su trabajo o empleo,* y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que

---

(²) Para una discusión sobre los distintos tipos de escrutinio utilizados en diversidad de situaciones véase S. Bice, *Standards of Judicial Review Under the Equal Protection and Due Process Clauses,* 50 S. Cal. L. Rev. 689 (1977).

(³) Véase 4 Diario de Sesiones de la Convención Constituyente 2566 (1951).

nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley. (Énfasis suplido.)

Una lectura de la antes mencionada disposición constitucional nos convence de que la Convención Constituyente tuvo el propósito de concederle al obrero puertorriqueño una protección específica, en la esfera de la relación obrero patronal, contra "riesgos" que atenten contra su "intimidad o privacidad", o, lo que es lo mismo, contra su "integridad personal".

No obstante no haber encontrado en el historial de la citada Sec. 16 discusión alguna de la Convención sobre esta cláusula en específico y menos aún del significado que para los constituyentes tenía el concepto de "integridad personal", (4) opinamos que el mismo obviamente debe tener un contenido más amplio y distinto que el de "salud", el cual, como hemos visto, es igualmente garantizado por la Sec. 16. Por otro lado, no creemos que pueda argumentarse con éxito que el referido concepto sólo conceda protección contra lesiones corporales; ese sería el caso si estuviéramos ante el concepto de "integridad física" que en el caso de menores protege la Sec. 15 del Art. II de nuestra Constitución. Por último, aun los tratadistas españoles que parten inicialmente de una definición objetiva y limitada del concepto "persona" (sujeto activo o pasivo en una relación jurídica) se ven compelidos a reconocer una dimensión más amplia del mismo. Así, Lacruz Berdejo nos dice: "Pero aún tiene la persona una superior dimensión, especial y diferenciada de los anteriores, donde se manifiesta su propia entidad y en todo su valor, sencillamente como persona, susceptible en tal calidad de sufrir agresiones físicas o

---

(4) La única otra alusión al concepto de "persona" en la Carta de Derechos se encuentra en la Sec. 10 que protege contra los registros y allanamientos irrazonables. Allí indudablemente "persona" delimita un ámbito de expectativa legítima de privacidad e intimidad.

morales desde el exterior y, por tanto, necesitada de protección en esa misma acepción y terreno. En este último plano se sitúan los llamados 'derechos de personalidad', que pretenden garantizar a la persona —ya no sujeto de Derecho, ni tampoco objeto, sino simplemente *persona* (nada más y nada menos)— el goce y respeto de su propia entidad e integridad en todas sus manifestaciones físicas y espirituales." J. L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. I, Vol. II, pág. 29.

Dicho con el mayor respeto, no entendemos ni compartimos la diferencia que intenta establecer el compañero Juez Asociado Señor Hernández Denton entre "integridad personal" e "intimidad". Somos del criterio que "integridad personal" e "intimidad" si no son sinónimos, por lo menos, el primero es componente del segundo. Dicho en otras palabras, lo que atenta contra la "integridad personal" de un trabajador igualmente atenta contra su "intimidad".

## III

Este derecho que le concede nuestra Constitución al obrero, sin embargo, no es absoluto. Mas lo claro e inequívoco de este mandato constitucional y aspiración de nuestro pueblo lo convierte, aun ante el patrono privado, [5] en un derecho fundamental, el cual para ser limitado requiere que éste demuestre un interés apremiante, *cf. Amy* v. *Adm. Deporte Hípico*, 116 D.P.R. 414 (1985). La recurrida no ha podido demostrarnos que tenga un interés de tal magnitud que precise de la limitación del derecho de privacidad de sus empleados.

---

[5] Estamos convencidos de que la Asamblea Constituyente no tuvo intenciones de exceptuar de las disposiciones de la Sec. 16 a los patronos privados. Véase 3 Diario de Sesiones de la Asamblea Constituyente 1607–1622 (1952).